REVISED, August 4, 1997

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-10990
_____

ROBERT P. BURCH,

Plaintiff-Appellee,
Cross-Appellant,

versus

COCA-COLA, CO.,

Defendant-Appellant,
Cross-Appellee,

_____

Appeals from the United States District Court for the
Northern District of Texas
_____
July 30, 1997

Before GARWOOD, WIENER and DEMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff-appellee, cross-appellant Robert P. Burch (Burch) brought this suit under the Americans with Disabilities Act (ADA) asserting that his termination by his employer defendant-appellant, cross-appellee Coca-Cola Co. was in violation of the ADA. Burch also advanced Texas law claims of intentional infliction of emotional distress and defamation. The trial court granted Coca-Cola's motion for summary judgment on the state law claims and granted judgment as a matter of law for Coca-Cola on the ADA intentional discrimination claim. The jury returned a verdict in favor of Burch on the ADA reasonable accommodation claim. Coca-

Cola appeals the denial of its motion for judgment as a matter of law on the reasonable accommodation claim. Burch cross appeals the judgment as a matter of law on his intentional discrimination claim and the summary judgment on his defamation claim. We hold that Coca-Cola was entitled to judgment as a matter of law on both the intentional discrimination and the reasonable accommodation ADA claims, and that summary judgment was properly awarded to it on the defamation claim.

## Facts and Proceedings Below

Burch, a former management-level employee of Coca-Cola, brought this suit against his former employer under the ADA. Burch, a recovering alcoholic, alleged that Coca-Cola terminated him because of his alcoholism and, alternatively, failed to accommodate his disability by terminating him instead of permitting him to return to work after he successfully completed a rehabilitation program.

Coca-Cola recruited Burch in mid-1989. At that time, Burch was a twenty-four-year veteran of the General Electric Company having achieved some success in various management positions. Burch commenced his employment with Coca-Cola in July 1989 as an area service manager for the company's Fountain Division. Coca-Cola assigns service responsibility by geographic area, dividing the country into several regions. As the area service manager for the southwest region, Burch was responsible for managing Coca-Cola's service network for a region that included all of Texas and stretched from North Dakota to Colorado and from Mississippi to

2

parts of Arizona.  He directly supervised approximately twenty Coca-Cola employees.

Burch's tenure with Coca-Cola was largely without incident and he was evaluated consistently as a manager who met requirements in a satisfactory manner.  In 1991, Coca-Cola recognized Burch as the Area Service Manager of the Year.  In July 1993, Burch received his highest overall evaluation score—an "M.E."——which signified that Burch "met or exceeded" goals.  Burch's evaluations, however, reflect that "working relationships" was a "developmental area" for him.  Burch was never formally reprimanded for improper behavior prior to his termination in November 1993.

In May 1992, Burch sought, and began receiving, counseling pursuant to Coca-Cola's Employee Assistance Program (EAP).  Counseling pursuant to Coca-Cola's EAP is confidential; counselors are not permitted to notify Coca-Cola of the matters discussed or the name of the particular employee seeking counseling.  Clinical social worker Cynthia Maddox, an EAP-provided counselor, saw Burch from May 29, 1992, until August 31, 1992, and again on February 3, 1993.  Burch and Maddox primarily discussed relationship problems Burch was having with his then-current girlfriend.  Burch, who has been married four times, was troubled with his inability to have lasting personal relationships.  Although Maddox did not treat Burch for alcohol abuse, she noted a possible alcohol problem.

On February 3, 1993, Burch requested a psychiatric referral from Maddox.  Maddox referred Burch to Dr. Joel Holiner, a psychiatrist in private practice, after concluding that Burch was

exhibiting "obsessive, compulsive, and paranoid" behavior.

Burch saw Dr. Holiner in February 1993. Dr. Holiner diagnosed Burch as suffering from "adjustment disorder with depressed mood" and "probable alcohol abuse." Dr. Holiner in turn referred Burch to Dr. Marcelo Matamoros, a psychotherapist in private practice, for additional therapy. Dr. Matamoros began treating Burch several days after his referral, also in February 1993.

Burch testified that throughout this time he was drinking heavily during his off hours, routinely drinking eight or ten beers in the evening. Burch also testified that, although he never drank during working hours, he experienced hangover-like symptoms in the mornings and attempted to isolate himself from interaction with people. Burch would close his office door and complete paperwork in the morning to avoid contact with other Coca-Cola employees, explaining that he "wasn't a morning person."

Although Burch had been a regular drinker since age fourteen, he testified at trial that he believed his tenure at Coca-Cola exacerbated his problems with alcohol. Burch testified that alcohol was served regularly at Coca-Cola functions and that he drank regularly with both his peers and supervisors during business trips. The Coca-Cola "culture," as characterized by Burch, amounted to a fraternity of drinkers and contributed to his alcoholism. Burch testified that at his first Coca-Cola meeting in 1989, his supervisor, Bill Speer, called for an afternoon "beer break" instead of a coffee break. Similarly, Burch claimed that company-sponsored cocktail hours were common and that managers

4

typically frequented bars and cocktail lounges after area service managers meetings.

Bill Speer was replaced as Burch's supervisor by Jose Smith, a man who Burch claimed had an exceedingly aggressive management style. Burch experienced no problems with his professional working relationship with Smith and no testimony was presented concerning any contact between Burch and Smith outside of their respective professional responsibilities. Smith's evaluations of Burch were unremarkable; Burch was rated as a competent area service manager with no noted problems of any significance.

Burch's third supervisor, Perry Cutshall, replaced Smith after approximately two years in 1991. Burch testified that he "tried real hard to build a relationship" with Cutshall, regularly drinking with him in Atlanta after monthly area service managers meetings. Burch further testified that Cutshall had been intoxicated on at least one occasion and that drinking after the meetings was "part of the protocol." Burch contended at trial that he informed Cutshall in 1992 that he had sought EAP counseling, but did not specify that he was concerned about an alcohol problem.

Burch also testified that he drank extensively with his fellow area service managers George Hawkins and Jerry Allen, although he contended that he curtailed his social drinking after he entered counseling with Maddox in 1992. Burch testified that he believed that Hawkins and Allen––whom he considered to be close social friends of Cutshall––ostracized him in 1992 when he stopped drinking with them after meetings and on business trips. Burch

5

admitted, however, that Cutshall recommended him for two positions that would have been considered promotions after the perceived ostracism began in May 1992.

The only testimony concerning inappropriate conduct on the job by Burch prior to September 1993 was an incident involving a Coca-Cola customer service representative, Lajuanna Ajayi, in March 1993. The incident involved a McDonald's restaurant that had been without fountain service for an extended period. After unsuccessful attempts to reach an intermediate service manager, Ajayi contacted Burch directly by pager. Although the precise facts were contested at trial, it was established that Burch, who was in Toronto, was short with Ajayi when he answered the page. Ajayi complained to her supervisors, who in turn reported the incident to Cutshall. Cutshall spoke with Burch about the incident in Atlanta shortly after it occurred. Burch apologized to Ajayi but no formal reprimand was made by Cutshall.

The events leading up to Burch's termination began at a September 22, 1993, area service mangers meeting in Atlanta. The meeting, at which approximately thirty-five Coca-Cola managers from around the country were in attendance, was held in a warehouse in Dunwoody, Georgia, a suburb north of Atlanta. The meeting lasted all day, with presentations from Coca-Cola managers concerning various procedures and developments affecting the fountain division. Burch testified that, during the meeting, Allen and Hawkins made repeated derogatory comments about him. Burch's version of the events of the meeting were largely corroborated by

6

the participants.  There was testimony to the effect that joking and bantering between the managers was routine, although Burch testified that the disruptions at the meeting were exceptional.  At the time of the September 1993 meeting, Allen was assigned to a position at the customer communications center that was roughly equivalent to Burch's status as an area service manager.  Hawkins was Allen's superior.

After the meeting concluded that afternoon, the participants went to the Dunwoody Holiday Inn for a reception honoring Max Trowbridge, who was the outgoing area service manager for New York and was transferring to Coca-Cola's Integrated Operating Systems (IOS) division.  According to Burch, Trowbridge's transfer was not an advancement, but rather a result of his poor performance as an area service manager.  The evening event commenced at six o'clock and began with a cocktail hour in a reception room at the hotel. Burch testified that he had had several drinks, but did not become intoxicated.  Dinner was also served in the reception room.

Burch testified that Trowbridge, while addressing the group, said that Burch was "a good candidate for" IOS.  Burch took offense at this comment, which he considered to be an attack on his competence.[1]  Burch further testified that Hawkins rejoined with "Perry would enjoy that," referring to Burch's supervisor Cutshall. The room laughed at the remarks and Burch turned to face the table

---

[1]     Brady Lum, a manager affiliated with IOS, testified that he interpreted the remarks as a compliment.

at which Allen, Hawkins, and Cynthia Bilbo[2] were sitting. Because Hawkins's back was toward Burch, Burch pointed at Allen and mouthed "fuck you" twice and "get off my ass." Burch, as he admitted, at the same time also motioned with his head for Allen to meet him outside the room. Burch testified that, throughout the exchange, Allen kept laughing. Burch—who is some 6'5" tall, weighed about 223 pounds, and biked some 100 to 200 miles a week—admitted that he had then been "red in the face" and "very angry," but stated that he never left his chair and never intended to engage in any physically violent behavior. After the episode, a manager seated at Burch's table, Mike Memoli, told Burch to calm down. Burch remained seated at his table for the remainder of the dinner without incident.

Burch testified that Hawkins apologized to him after dinner for the remarks he had made throughout the day at the meeting and at the dinner. Cutshall was not aware that the episode had occurred until after the dinner was over.[3] Cutshall and Burch did not speak about the incident at the following day's meeting. Burch

---

[2] There was testimony to the effect that Bilbo was among the group during the afternoon meeting that had made antagonistic comments toward Burch. In September 1993, she was assigned to the customer communications center and reported directly to Allen. The jury heard testimony that both at the time of the incident and during the trial Bilbo had a romantic relationship with Cutshall.

[3] Bilbo testified that she informed Cutshall as the dinner was breaking up. Cutshall testified that he spoke with Allen and Hawkins to get their versions later that evening. Cutshall spoke with Lum about the incident the next day, September 23, 1993. The evening of September 22, 1993, Cutshall also learned of an earlier incident between Burch and another Coca-Cola manager, James Britton.

returned to Dallas the evening of September 23, 1993.

Upon his return to Dallas, Burch attempted to contact Dr. Matamoros, who was out of town. Burch spoke with the counselor on duty who recommended consultation with a psychiatrist because of the severity of Burch's depression and described alcohol abuse.

The following afternoon, September 24, 1993, Burch learned from John Barker, an area service manager from St. Louis who had also attended the dinner in Atlanta, that the Coca-Cola human resources department was investigating Burch's conduct at the dinner. Burch testified that he attempted unsuccessfully to contact Cutshall on Friday to discuss the incident.

On Saturday, September 25, 1993, Burch spoke with Cutshall, who informed him of the pending human resources investigation. Cutshall directed Burch to discuss his version of the incident with Frank Tola, who was to lead the investigation. Burch told Cutshall for the first time that he was experiencing problems with alcohol abuse and that he intended to undergo treatment at Charter Hospital in Dallas. Burch testified that he spoke with several managers on Saturday who had attended the Atlanta meeting and dinner concerning the incident and its severity.

On Sunday, September 26, 1993, Burch was admitted voluntarily to Charter Hospital. Dr. Edgar Nace was Burch's treating physician, who admitted Burch on an in-patient basis. Burch remained at Charter Hospital until October 6, 1993, at which point he became a day patient. Burch then contacted Cutshall and requested to return to work on a part-time basis. Cutshall

9

informed Burch that he could not return as he was on suspension pending completion of the human resources investigation. Burch remained on full salary throughout his treatment (which was paid for by Coca-Cola's benefit plan) and until his termination.

On October 27, 1993, Burch sent a letter to Tola requesting to "return to work immediately." Letters from Dr. Nace and Dr. Matamoros were also then forwarded to Tola attesting to Burch's readiness to return to work at Coca-Cola. In a memorandum dated October 27, 1993, Tola recommended that Burch be discharged for his behavior at the dinner. Tola's recommendation was supported by six Coca-Cola managers.

Tola asked Burch to return to his office in Dallas on November 4, 1993. Upon his arrival he was met by Tola and Cutshall, who informed Burch that he was terminated from his employment with Coca-Cola for "performance issues." Burch was asked to return all company property and was escorted off the premises by an off-duty police officer.

The following Monday, Burch went to the offices of Drake, Beam & Morin, a placement firm used by Coca-Cola. During his visit, Burch testified that he was met by an employee who wanted reassurances that Burch would not behave improperly while in the Drake, Beam & Morin offices. Burch further testified that the questions were a result of a facsimile received from Coca-Cola stating that Burch had been terminated for "violent and threatening behavior." Burch left the offices.

Since his termination from Coca-Cola, Burch has held two

subsequent managerial jobs. The first, a $115,000 a year management position with Bell Packaging in Michigan, lasted from April to September 1994, when he was terminated for a conflicting management style. The second, a $60,000 a year management position with Montgomery Ward in Dallas, ended after several months when Burch resigned in lieu of termination.

Burch filed suit in state court in Dallas County, Texas, alleging that he had been terminated in violation of the ADA and asserting state law claims of defamation and intentional infliction of emotional distress. Coca-Cola removed the action to the United States District Court for the Northern District of Texas (Dallas Division). Pursuant to 28 U.S.C. § 636(c), the parties consented to trial before a magistrate judge.

Coca-Cola filed a motion for summary judgment on all claims. After Burch's response was filed, the magistrate judge issued a memorandum order granting summary judgment in favor of Coca-Cola on the Texas law defamation and intentional infliction of emotional distress claims and denying summary judgment on Burch's ADA claims.

The case was tried before a jury in Dallas. At the close of Burch's evidence, Coca-Cola made a motion for judgment as a matter of law pursuant to Rule 50. The magistrate judge granted the motion on the ADA intentional discrimination claim but denied the motion on the ADA reasonable accommodation claim. Coca-Cola's renewed motion (on the reasonable accommodation claim) at the close of all the evidence was denied.

The jury returned a verdict in favor of Burch, finding that

11

Coca-Cola terminated Burch in violation of the ADA. The jury awarded Burch $109,000 in backpay, $700,000 in front pay, $300,000 in compensatory damages, and $6,000,000 in punitive damages. Coca-Cola moved for judgment as a mater of law or, in the alternative, for a new trial.

The magistrate judge denied Coca-Cola's motion and entered judgment for Burch. The magistrate judge reduced the front pay award to $294,777 (representing the discounted value of five years front pay), reduced the punitive damage award to zero, and awarded Burch attorneys' fees of $208,072. Coca-Cola renewed its motion for judgment as a matter of law or a new trial. The magistrate judge denied Coca-Cola's motion.

Coca-Cola has appealed. It asserts that the magistrate judge erred by denying its motion for judgment as a matter of law on the ADA reasonable accommodation claim, by denying its motion for a new trial, and by awarding an excessive amount of compensatory damages. Burch has cross appealed. He asserts that the magistrate judge erred by granting Coca-Cola summary judgment on his Texas law defamation claim and by granting Coca-Cola's motion for judgment as a matter of law on his ADA intentional discrimination claim.

## Discussion

Both parties appeal from the magistrate judge's rulings on Coca-Cola's Rule 50 motions for judgment as a matter of law. This Court reviews *de novo* rulings on Rule 50(a) and (b) motions, using the same standards as those to be employed by the trial court. *RTC v. Cramer*, 6 F.3d 1102, 1109 (5th Cir. 1993).

12

After a party has been fully heard on an issue, a trial court may grant an opposing party's motion for judgment as a matter of law if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). In such circumstances, we view the entire trial record in the light most favorable to the non-movant, drawing reasonable factual inferences in its favor. *Conkling v. Turner*, 18 F.3d 1285, 1300 (5th Cir. 1994). "'The 'decision to grant a directed verdict . . . is not a matter of discretion, but a conclusion of law based upon a finding that there is insufficient evidence to create a fact question for the jury.'" *Id.* at 1300-01 (quoting *In re Letterman Bros. Energy Sec. Litig.*, 799 F.2d 967, 972 (5th Cir. 1986), *cert. denied*, 107 S.Ct. 1373 (1987)). "If the facts and inferences point so strongly and overwhelmingly in favor of the moving party . . . that reasonable jurors could not have arrived at a contrary verdict, then we will conclude that the motion should have been granted." *Cramer*, 6 F.3d at 1109 (5th Cir. 1992) (citing *Boeing v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc)).

I.   Reasonable Accommodation

"'The ADA is a federal antidiscrimination statute designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to persons without disabilities.'" *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 161 (5th Cir.) (quoting 29

13

C.F.R. § 1630, App. (1995)), *cert. denied*, 117 S.Ct. 586 (1996). In order to achieve this goal, the ADA prohibits——as a form of discrimination——an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [an employer] can demonstrate that the accommodation would impose an undue hardship."  42 U.S.C. § 12112(b)(5)(A) (1995).

The ADA, its implementing regulations, and the EEOC's interpretive guidance make clear that an employer's obligation to provide a "reasonable accommodation," when triggered, contemplates changes to an employer's procedures, facilities, or performance requirements that will permit a qualified individual with a disability to perform the essential functions of his or her job. In all cases a reasonable accommodation will involve a change in the status quo, for it is the status quo that presents the very obstacle that the ADA's reasonable accommodation provision attempts to address.  The ADA provides:

> "The term 'reasonable accommodation' may include--
>     (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>     (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."  42 U.S.C. § 12111(9).

In addition to repeating the examples of reasonable accommodations set forth in the statute, the regulations define the term as

14

"[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(*o*)(1)(ii) (1996). The EEOC's interpretive guidance also emphasizes the protean nature of the employer's obligation. *See* 29 C.F.R. § 1630, App. (1996) ("In general, an accommodation is any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal employment opportunities.").

We conclude that this case was improperly tried on a reasonable accommodation theory. First, Burch failed to establish that his alcoholism interfered in any way with his ability to perform the essential functions of an area service manager for Coca-Cola without reasonable accommodation or, for that matter, that his alcoholism ever substantially impaired *any* major life activity. Second, Burch failed to establish that he ever requested any modification or adjustment to his job as an area service manager with Coca-Cola. A wrongful termination claim under the ADA is not properly analyzed under a reasonable accommodation theory unless an employer is shown to have terminated a qualified individual with a disability in order to avoid accommodating that employee's impairments at the workplace. Accordingly, an employee who requests only the opportunity to return to an unmodified, previously-held position fails to state a cognizable claim under 42 U.S.C. § 12112(b)(5).

15

A.    Burch's Limitation

"[T]he ADA requires employers to reasonably accommodate limitations, not disabilities." *Taylor*, 93 F.3d at 164. This is a critical distinction, because the existence vel non of a disability or impairment is material to a reasonable accommodation claim only insofar as it limits an employee's ability to perform his or her job.[4] *Id.* ("Thus, while a given disability may limit one employee (and therefore necessitate a reasonable accommodation), it may not limit another."); *see also Beck v. University of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) ("It is plain enough what 'accommodation' means. The employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work.") (quotation omitted). Accordingly, an impairment must be substantially limiting *at the time of the requested accommodation*. *See Pritchard v. The Southern Co. Servs.*, 92 F.3d 1130, 1133 (11th Cir. 1996); *Muller v. Automobile Club of S. Ca.*, 897 F.Supp. 1289, 1295-96 (S.D. Ca. 1995).

The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable

---

[4]    Burch argues that "to be protected under the ADA, an individual need only show that a major life activity is substantially limited; there is no requirement that the individual also show that he is limited in the activity of working as well." This is true insofar as Burch may assert a claim for intentional discrimination under the ADA. To assert a discrimination claim under the reasonable accommodation provision, however, Burch must demonstrate that a substantially limiting impairment somehow affected his ability to perform his job. Without such a showing, there would be nothing for an employer to accommodate.

16

accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA further defines an actionable disability, in relevant part, as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." *Id.* § 12102(2)(A). "Physical or mental impairment,"[5] "substantially limits,"[6] and "major life activities"[7] are all defined in the applicable regulations.

Coca-Cola contends that Burch failed to establish that he was a qualified individual with a disability as required by the ADA.

---

[5]

"(h) *Physical or mental impairment* means:
(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or
(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. §1630.2(h) (1996).

[6]

"(j) *Substantially limits*--(1) The term *substantially limits* means:
(i) Unable to perform a major life activity that the average person in the general population can perform; or
(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Id.* § 1630.2(j).

[7]

"(i) *Major Life Activities* means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* § 1630.2(i).

17

In response, Burch makes a number of arguments in support of his assertion that his alcoholism made him a "qualified individual with a disability."  The first, briefly stated, is that Dr. Nace, Burch's expert, said it did.  The relevant testimony of Dr. Nace is as follows:

> "Q.  I want to read to you the definition of disability under the Americans with Disabilities Act.  It says, 'The term disability means with respect to an individual a physical or mental impairment that substantially limits one or more of the major life activities of such individual.'  Using that definition is an alcoholic disabled?
> A.   Yes.
> Q.   In your opinion does Bob fit the definition of disabled under he [sic] Americans with Disabilities Act?
> A.   Yes, I think so."

Dr. Nace's testimony, even as Burch's treating physician, sheds no light on the individualized inquiry required by the ADA.  Dr. Nace testified only in general terms about alcoholics as a class.  The only testimony given by Dr. Nace concerning Burch individually concerned Burch's ability to function without limitation.[8]  As the EEOC's interpretive guidance makes plain, the ADA does not attempt to set forth a laundry list of impairments that are disabilities. *See* 29 C.F.R. § 1630, App. (1996) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.  Some

---

[8]     Dr. Nace agreed that by mid-October 1993 Burch would have been "a better employee than he was before," and "a more productive and improved employee."  On cross-examination, Dr. Nace acknowledged that Burch's status as a recovering alcoholic did not affect his ability to walk, sit, hear, work, or participate in any "usual activities."

18

impairments may be disabling for particular individuals but not for others . . . ."). Unlike HIV infection, the EEOC has not attempted to classify alcoholism as a per se disability, and we decline to adopt such a questionable position. *See id.; Foreman v. The Babcock & Wilcox Co.,* No. 96-60510 (5th Cir. July 10, 1997)(employee's heart condition with surgically implanted pacemaker did not substantially limit the major life activity of working); *Robinson v. Global Marine Drilling Co.*, 101 F.3d 35, 37 (5th Cir. 1996) (asbestosis sufferer who experienced episodic shortness of breath due to a reduced lung capacity was not substantially limited in the major life activity of breathing); *Oswalt v. Sara Lee Corp.*, 74 F.3d 91, 92 (5th Cir. 1996) ("'[h]igh blood pressure, alone, without any evidence that it substantially affects one or more major life activities, is insufficient to bring an employee within the protection of the ADA'"); *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 & n.11 (5th Cir. 1995) (evidence of a partially crippled arm insufficient to meet the standard of substantially limiting a major life activity); *see also McKay v. Toyota Motor Mfrg., USA, Inc.,* 110 F.3d 369, 372 (6th Cir. 1997)(diagnosed "carpal tunnel syndrome" did not substantially limit the major life activity of working); *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 15 (1st Cir. 1997) (employee's dysthymia, a chronic depressive disorder, did not substantially limit the assumed major life activity of "get[ting] along with others").

Second, Burch makes reference to his testimony that his ability to walk, talk, think, and sleep were affected when he drank

19

too much.  Burch also testified that he had hangovers in the morning that affected his memory.  That Burch's inebriation was temporarily incapacitating is not determinative.  Burch produced no evidence that the effects of his alcoholism-induced inebriation were qualitatively different than those achieved by an overindulging social drinker:  in both situations, the natural result of overindulgence is the *temporary* impairment of senses, dulled reactions, and the prospect of a restless sleep followed by an unpleasant morning.  Although Burch's alcoholism assuredly affected how he lived and worked, "far more is required to trigger coverage under § 12102(2)(A)."  *Ellison v. Software Spectrum*, 85 F.3d 187, 191 (5th Cir. 1996).  Burch's testimony that his inebriation was frequent does not make it a permanent impairment.  Permanency, not frequency, is the touchstone of a substantially limiting impairment.  Although Burch's alcoholism may have been permanent, he offered no evidence that he suffered from any substantially limiting impairment of any significant duration.[9]  We have previously rejected attempts to transform temporary afflictions into qualifying disabilities.  *See Rogers v.*

---

[9]    This is not to say that an alcoholic can never demonstrate a substantially limiting impairment.  But where, as here, an alcoholic's only proffered impairments are the primary result of temporary inebriation, such proof is insufficient. Burch offered no testimony that his alcoholism-induced inebriation permanently altered his gait, his ability to speak properly, his memory when sober, or produced long-term insomnia.  In fact, when Burch began treatment for his alcoholism in late September 1993, he reported to Charter Hospital that he had been bicycling recreationally between 100 and 200 miles a week.  Burch concedes that, prior to his paid leave to undergo treatment, his work was unaffected by his alcoholism.  Burch testified that he never drank during working hours.

20

*International Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir. 1996); *Rakestraw v. Carpenter Co.*, 898 F. Supp. 386, 390 (N.D. Miss. 1995); *see also Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997); *Sanders v. Arneson Products, Inc.*, 91 F.3d 1351, 1354 (9th Cir. 1996), *cert. denied*, 117 S.Ct. 1247 (1997); 29 C.F.R. § 1630.2(j), App. (1996) ("[T]emporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities.").

Third, Burch argues that "[t]he fact that Burch ultimately had to be hospitalized establishes that his alcoholism substantially limited his major life activities." For this proposition, Burch relies upon *School Bd. of Nassau County v. Arline*, 107 S.Ct. 1123, 1127 (1987), a Rehabilitation Act case involving a claimant suffering with an acute form of tuberculosis so severe that it required hospitalization. In *Arline*, the Supreme Court, describing the effect the plaintiff's tuberculosis had on her respiratory system, observed, "[t]his impairment was serious enough to require hospitalization, a fact more than sufficient to establish that one or more of her major life activities were substantially limited by her impairment." *Id.* (noting that her hospitalization established a record of impairment under the Rehabilitation Act).

The quoted language from *Arline* cannot be construed to obviate the requirement, explicit in the ADA and its implementing regulations, that purported conditions be examined to ascertain whether a specific condition substantially limited a major life activity. The ADA requires an individualized inquiry beyond the

21

mere existence of a hospital stay. Although the Court in *Arline* noted that the plaintiff's hospitalization established a *record* of impairment, the defendant had conceded that her acute tuberculosis had been substantially limiting. Indeed, the defendant's position in *Arline* was not that the plaintiff was not "handicapped," but rather that her contagious disease――tuberculosis――was a threat to the health of others (and therefore precluded liability for termination on that basis). To accept Burch's reading would work a presumption that any condition requiring temporary hospitalization is disabling――a presumption that runs counter to the very goal of the ADA. *See Ellison*, 85 F.3d at 190-91 (plaintiff who worked a modified schedule during radiation treatment for breast cancer had failed to establish a substantially limiting impairment under the ADA); *Demming v. Housing and Redev. Auth.*, 66 F.3d 950, 955 (8th Cir. 1995) (rejecting plaintiff's position that, under *Arline*, proof of hospitalization for thyroid cancer established a disability under the Rehabilitation Act); *Sanders*, 91 F.3d at 1354 (psychological impairment requiring treatment and precluding work for three and a half months "not of sufficient duration to fall within the protections of the ADA as a disability"); *Taylor v. United States Postal Service*, 946 F.2d 1214, 1217 (6th Cir. 1991) (*Arline* should not be read "as establishing the nonsensical proposition that *any* hospital stay is sufficient to evidence a 'record of impairment'" under the Rehabilitation Act); *Coghlin v. H.J. Heinz Co.*, 851 F. Supp. 808, 813 (N.D. Tex. 1994) (*Arline*'s analysis did not address the

22

"substantially-limits" portion of disability under the ADA).

Fourth, Burch contends that his impairment must be viewed without regard to "mitigating measures." The EEOC's interpretive guidance does state that "[t]he existence of an impairment is to be determined without regard to mitigating measures such as medicines, or assistive or prosthetic devices." 29 C.F.R. § 1630.2(h), App. (1996). Even assuming, however, that Burch's treatment for alcoholism was the equivalent to a diabetic's insulin dose—a proposition neither supported by the record nor judicially noticeable—we note that Burch failed to establish that his *untreated* alcoholism substantially limited any major life activity or that he *required* any continuing treatment whatsoever after he completed the rehabilitation program at Charter. *Cf. Harris v. H&W Contracting Co.*, 102 F.3d 516, 522-23 (11th Cir. 1996) (finding material issue of fact existed as to whether employee with Grave's disease was substantially limited where there was evidence that prior overdosage of thyroid medication produced "panic attack" and that withdrawal of medication would cause coma and death).

Burch admonishes the Court that if his successful completion of rehabilitation precludes him from recovery under the ADA we will produce "the anomalous result of affording protection for alcoholics who continue to drink, but not for those who are recovering." Not so. It is not difficult to imagine the myriad types of health problems, both physical and mental, that continue to plague even recovering alcoholics. Under different circumstances—and additional evidentiary support—an alcoholic may

23

establish the need for reasonable accommodation of an alcoholism-induced impairment. Burch simply has not done so; there is insufficient evidence in the record to support a jury finding that Burch ever suffered a substantial impairment of a major life activity, much less that he did so on or after October 27, 1993. Although Burch's alcoholism would not necessarily preclude him from asserting reasonable accommodation rights under the ADA, it plainly does not excuse his failure to meet the statutory prerequisites.[10]

B.    Requested Accommodation

In addition to Burch's failure to establish that he was a qualified individual with a disability, his failure to request a cognizable, reasonable accommodation also demonstrates the magistrate judge's error in submitting this case to the jury on a reasonable accommodation theory.

As set forth above, the ADA contemplates modifications or adjustments to an employer's procedures, facilities, or, perhaps,

---

[10]    Burch discerns in the ADA's legislative history a congressional intent to assist recovering alcoholics. Burch draws this conclusion principally from Congress's decision *not* to exempt alcoholics in 42 U.S.C. § 12114 as it had current users of illegal drugs. The decision not to exclude alcoholics peremptorily, however, is far from a decision to confer disabled status without the inquiry prescribed by the ADA. Congress has been especially reluctant to confer privileges on the basis of alcoholic status alone. *See, e.g.*, Contract with America Advancement Act of 1996, Pub. L. No. 104-121, § 105, 110 Stat. 847, 852-55 ("An individual shall not be considered to be disabled for purposes of this title if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled.") (denying Social Security disability benefits to alcoholics). Wherever Congress's sympathies lie, we find no evidence in the legislative history or elsewhere of a congressionally conferred exemption for alcoholics from the rigors of the scheme set forth in the ADA.

24

performance requirements to enable a disabled employee to accomplish his or her job. Burch never requested Coca-Cola to change any aspect of his job. To the contrary, Burch has contended consistently that he required no job concessions——that he was in every way fit to return to precisely the same position, the same responsibilities, the same schedule, the same supervisor, and even the same office that he had prior to his treatment at Charter.

Burch contends that Coca-Cola refused to provide him a reasonable accommodation on two separate occasions. First, he argues, Coca-Cola "refused Burch's request that he return to work part-time while he was still in treatment." We may dispose of this first contention of Burch's with dispatch. Although the jury was instructed as to an employer's reasonable accommodation obligations under the ADA, it was asked only: "Was Plaintiff Robert Burch *terminated* by Defendant The Coca-Cola Company in violation of the ADA?" The reasonableness of Coca-Cola's accommodation to Burch on October 6, 1993,——to retain him on full salary while he completed his treatment at Charter rather than take him back on a part-time basis——was not an issue that was before the jury.[11] There is no

---

[11] Even had Burch tried this case on the theory that Coca-Cola's refusal to permit him to return to work on a part-time basis on October 6, 1993, was a failure to provide a reasonable accommodation, which he did not, we have substantial doubt that Coca-Cola's decision to retain him on suspension with full pay was not a reasonable accommodation. Other courts have found that *unpaid* leave granted to an employee undergoing treatment can be a reasonable accommodation, *see Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995) ("Requiring paid leave in excess of an employee's scheduled amount would unjustifiably upset the employer's settled budgetary expectations, and thus cannot be considered a reasonable accommodation."), and that in some circumstances an employer may have no obligation to provide even unpaid leave, *see Hudson v. MCI*

25

record evidence that Coca-Cola terminated Burch because he could not return to work earlier than October 27, 1993, when he requested to return to work on a full-time basis. And, no evidence was introduced to support any damage award on a claim of failure to allow return to part-time work while still in treatment.

This Court will not consider on appeal a claim not submitted to the district court. "A party has presented an issue in the trial court if that party has raised it in either the pleadings or the pretrial order, or if the parties have tried the issue by consent." *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 331 (5th Cir. 1994). Burch's First Amended Complaint, upon which his case was tried, complains only of his ADA wrongful termination claim (in addition to his Texas law defamation and intentional infliction of emotion distress claims). The record before us contains no pretrial order. The jury was not charged concerning Coca-Cola's pretermination refusal to permit Burch to return to

---

*Communications*, 87 F.3d 1167, 1169 (10th Cir. 1996) (holding that unpaid leave of indefinite duration is not a reasonable accommodation). Certainly, Coca-Cola was not forced to create a part-time position if the essential functions of the area service manager's position demanded a full-time manager. *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996); *Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir. 1995) (citing *Chiari v. City of League City*, 920 F.2d 311, 318 (5th Cir. 1991)), *cert. denied*, 116 S.Ct. 1263 (1996).

Burch's citation of *Rizzo v. Children's Learning Ctrs., Inc.*, 84 F.3d 758, 765 (5th Cir. 1996), does not support his position. *Rizzo*, a summary judgment case in which this Court held that an employer's decision to lower a concededly disabled employee's hours, to require her to work a "split shift," and to change her position from bus driver to cook produced a fact issue as to whether there had been an adverse employment action, left unresolved whether the changes were an adverse employment action or were merely efforts to accommodate the employee's disability.

26

work on a part-time basis, and there was no request for such a change nor objection to its omission. There is nothing in the trial record to suggest—nor does Burch contend—that this separate claim was tried by consent as contemplated by Rule 15(b). *See Moody v. FMC Corp.*, 995 F.2d 63, 65-66 (5th Cir. 1993). In sum, Burch abandoned any such claim by not properly raising it in the district court.

Burch's second argument is that Coca-Cola "refused his request that he be allowed to come back to work full-time." As stated, this claim was not properly analyzed as a failure to accommodate. Burch did not request an accommodation, he requested to return to his position as he left it when he entered treatment on September 26, 1993. He sought no changes to his position and desired nothing more than the ability to resume his career where he had left it. It is undisputed that throughout his absence he had remained on full salary as a Coca-Cola employee.[12] Coca-Cola's employee benefit plan paid for his treatment. Burch argues that the jury was free to reject Coca-Cola's explanation that Burch was terminated for his improper behavior at the managers meeting, but whether Coca-Cola would have fired a nonalcoholic for the same behavior is relevant only to an intentional discrimination claim. Here, Burch requested only Coca-Cola's grace——a request that Coca-Cola refrain from an employment action that, absent conflict with the ADA's intentional

---

[12]    Burch does not complain that Coca-Cola ever denied a prospective request for a leave of absence. We therefore have no need to address whether an employer would be required, in certain circumstances, to offer a leave of absence to an employee whose alcoholism qualified as a disability under the ADA.

27

discrimination provision, Coca-Cola was left free to undertake.[13] The determination of whether Coca-Cola was required to refrain from terminating Burch because its true reasons for dismissal were discriminatory is at the heart of the *subjective* inquiry required to establish *intentional* discrimination under the ADA. Burch cannot characterize his intentional discrimination claim as a "request for accommodation" in order to take advantage of the *objective* inquiry under section 12112(b)(5). A qualified individual with a disability who asks *only* to return to work—but who is instead fired by his employer—is entitled (on a proper evidentiary showing) to have the jury consider whether the employer acted with *discriminatory* intent, not whether permitting the employee to return to his old (unmodified) job would have been reasonable. As Burch had advanced no cognizable request for accommodation at the time of his termination, Coca-Cola's decision to terminate him was not actionable under section 12112(b)(5).[14]

---

[13]    Burch was an at-will employee. Apart from the ADA's proscription of discrimination, Coca-Cola was free under Texas law to terminate Burch "for a good reason, a bad reason, or no reason at all." *Figueroa v. West*, 902 S.W.2d 701, 704 (Tex. App.--El Paso 1995, no writ); *see also Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 489 (Tex. 1991); *Jones v. Legal Copy, Inc.*, 846 S.W.2d 922, 925 (Tex. App.--Houston 1993, no writ).

[14]    Coca-Cola cites a number of cases for the proposition that employers are under no obligation to accommodate misconduct that is the product of an employee's alcoholism. These cases are a correct interpretation of section 12114(c)(4), which permits employers to hold alcoholic employees to the same standard of conduct as nonalcoholic employees. Section 12114(c)(4), unlike the pre-1992 Rehabilitation Act, does *not* require employers to excuse violations of uniformly-applied standards of conduct by offering an alcoholic employee a "firm choice" between treatment and discipline. *Compare Fuller v. Frank*, 916 F.2d 558, 562 (9th Cir. 1990) (discussing firm-choice rule); *Rodgers v. Lehman*, 869 F.2d 253, 259 (4th Cir.

We therefore hold that the magistrate judge should have granted

Coca-Cola's motion for judgment as a matter of law on Burch's

---

1989) (same), with *Johnson v. Babbitt*, EEOC No. 03940100, 1996 WL 159072 (EEOC Mar. 28, 1996) (finding 1992 amendment to Rehabilitation Act, 29 U.S.C. § 791(g), which incorporated section 12114(c)(4), eliminated the requirement that an employer provide a "firm choice" as an accommodation). *But cf. Office of the Senate Sergeant at Arms v. Office of Senate Fair Employment Practice*, 95 F.3d 1102 (Fed. Cir. 1996) (finding that amended Rehabilitation Act obliged employer to provide leave for treatment to a disabled alcoholic as a reasonable accommodation, but did not require a "retroactive accommodation" by excusing misconduct).

In the cases cited by Coca-Cola, the employer's reason for termination was either uncontested or unrefuted by the employee. *See, e.g., Siefkin v. Village of Arlington Hgts*., 65 F.3d 664 (7th Cir. 1995) (granting summary judgment in ADA case in which the plaintiff-employee conceded termination for failing to monitor and control his diabetes, causing an auto accident); *Maddox v. University of Tenn*., 62 F.3d 843, 848 (6th Cir. 1995) (granting employer's summary judgment motion where alcoholic football coach failed to rebut employer's evidence that it terminated him for misconduct); *Little v. FBI*, 1 F.3d 255, 259 (4th Cir. 1993) (affirming dimsissal of alcoholic FBI agent's ADA claim where "it plainly appears that the appellant was fired because of his misconduct [being drunk on duty], not because of his alcoholism"); *Rodgers v. County of Yolo Sheriff's Dep't*, 889 F.Supp. 1284, 1291 (E.D. Ca. 1995) (granting employer's summary judgment motion in Rehabilitation Act case involving an alcoholic police officer where evidence was "unrefuted and demonstrates that plaintiff['s] termination was based on poor performance"); *see also Collings v. Longview Fibre Co*., 63 F.3d 828, 831–32 (9th Cir. 1995) (affirming grant of summary judgment for employer of drug abusing employees where employees failed to rebut employer's contention that they were terminated for drug-related misconduct; specifically, no showing that other employees had been treated differently for engaging in similar conduct and no showing that employer knew employees were former drug abusers), *cert. denied*, 116 S.Ct. 711 (1996). Here, had Burch requested a cognizable (and reasonable) accommodation, and had he been a qualified individual with a disability, the jury arguably would have been free to reject Coca-Cola's proffered nondiscriminatory reason for termination. Burch did not so request and was not so qualified. Coca-Cola is correct, however, that a "second chance" or a plea for grace is not an accommodation as contemplated by the ADA. *See Siefkin*, 65 F.3d at 666 ("Siefkin is not asking for an accommodation; he is not asking the Village to change anything. He is asking for another chance . . . . But the ADA does not require this.").

29

reasonable accommodation claim.[15]

II.  Intentional Discrimination

Under Title I of the ADA, an employer cannot discriminate against a "qualified individual with a disability because of the disability of such individual in regard to . . . the hiring, advancement, or discharge of employees."  42 U.S.C. § 12112(a).  In order to establish a *prima facie* case of intentional discrimination under the ADA, this Circuit has required a plaintiff to present either direct evidence of discrimination or show "'(1) he or she suffers from a disability; (2) he or she is qualified for the job; (3) he or she was subject to an adverse employment action; and (4) he or she was replaced by a non-disabled person or was treated less favorably than non-disabled employees.'" *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995); (citing *McDonnell Douglas Corp. v. Green*, 93 S.Ct. 1817, 1824 (1973)).

At the close of Burch's case, Coca-Cola moved for judgment as a matter of law on Burch's intentional discrimination claim pursuant to Rule 50.  Coca-Cola based its motion on the grounds

---

[15]     Coca-Cola, quoting *Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679, 684 (5th Cir. 1986), further argues for a new trial because the size of the jury verdict—over $7 million prior to remittitur—was "'so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive.'"  Although our decision obviates the need to reach this issue, we note that even had Burch's case not suffered from the evidentiary deficiencies we find dispositive, a jury's verdict so grossly excessive as this would most probably warrant a new trial under the standard set forth in *Wells*.  Burch's argument that because his counsel requested $56 million from the jury—an amount argued to represent one day of Coca-Cola's net profits per day the jury heard the trial—the lower figure awarded "shows that [the jury] was not unduly prejudiced in Burch's favor" is not persuasive.

30

that Burch had not established that his alcoholism was a disability, that Burch had demonstrated neither that he had been replaced by a nonalcoholic employee nor that nonalcoholic employees had been treated more favorably, and that Burch had not shown any direct evidence of discriminatory motive on the part of Coca-Cola. The magistrate judge granted Coca-Cola's motion without stating specific grounds.

Burch argues that the magistrate judge's ruling was premised on an erroneous understanding of the *prima facie* elements of an intentional discrimination claim under the ADA. Specifically, Burch contends that the magistrate judge granted Coca-Cola's motion because Burch had failed to present evidence that he had been replaced by a someone who was not disabled (without permitting him to demonstrate disparate treatment). Such a position, Burch argues, is contrary to our established caselaw setting forth the *prima facie* case for intentional discrimination under the ADA. Amicus Curiae EEOC, which also understands the magistrate judge to have precluded Burch from advancing disparate treatment proof, urges reversal of that ruling.[16]

Coca-Cola argues that the magistrate judge's ruling is supportable on each of its three asserted grounds and that any confusion as to the ruling is explainable by the responses given by Burch's counsel in argument on the motion.[17]

---

[16] The EEOC took no position on any other issue in this appeal.

[17] There is some merit to Coca-Cola's contention. Burch's counsel argued before the trial court *not* that Burch had to demonstrate *either* that he had been replaced by a nondisabled

31

Because Burch failed to establish that he suffered from a disability as that term is defined in the ADA, and because such a failure is fatal to his ADA intentional discrimination claim, we affirm the magistrate judge's grant of Coca-Cola's Rule 50 motion on that basis.  Accordingly, we do not address whether Burch's disparate treatment evidence would have been sufficient to establish the fourth element of his *prima facie* case.

The ADA defines "disability" alternatively.  A plaintiff who sues on an intentional discrimination theory can rely on any of the three alternatives.  The ADA provides:

> "The term 'disability' means, with respect to an individual--
>      (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>      (B) a record of such an impairment; or
>      (C) being regarded as having such an impairment."
> 42 U.S.C. § 12102(2).

A.   Substantially Limiting Impairment

For the reasons set forth above, *see supra* part I.A., we hold that Burch failed to establish that his alcoholism ever substantially limited a major life activity, including the major life activity of working.

B.   Record of an Impairment

The ADA does not define "record of such an impairment," but

---

employee *or* was treated less favorably than nondisabled employees, but rather that he was required to demonstrate *neither*.  Burch's counsel argued that, under the rule set forth in *Doe v. Kohn Nast & Graf, P.C.*, 862 F.Supp. 1310, 1318 & n.5 (E.D. Pa. 1994), the fourth prong of the *McDonnell Douglas* standard was inapplicable in a wrongful termination claim.  Of course we have never so held and Burch does not advance this argument on appeal.  *See Daigle*, 70 F.3d at 396.

the regulations and the interpretive guidance promulgated by the EEOC make clear that Burch, at some point in the past, must have met or been classified as meeting the standard set forth in section 12102(2)(A). The regulations provide:

> "(k) *Has a record of such impairment* means has a history of, or has been misclassified as having, *a mental or physical impairment that substantially limits one or more of the major life activities.*" 29 C.F.R. § 1630.2(k) (1996) (second emphasis added).

The interpretive guidance also stresses that "[t]he impairment indicated in the record must be an impairment that substantially limits one or more of the individual's major life activities." 29 C.F.R. § 1630, App. (1996).

Burch's argument that he had a record of an impairment when Coca-Cola fired him rests entirely on the assumption that his alcoholism substantially limited a major life activity prior to his treatment at Charter. We have already rejected this contention. At most, Burch had a record of treatment for alcohol abuse and/or alcoholism. That Burch's alcoholism was severe enough to warrant treatment does not establish a record of a disability. As we have determined that Burch offered insufficient evidence establishing that even his *untreated* alcoholism substantially limited any major life activity, we fail to see how treatment for a nondisability alters his status in any significant way. Accordingly, we hold that Burch was not an individual with a record of an impairment that substantially limited any major life activity under section 12102(2)(B).

C.   Regarded as Having an Impairment

33

"One is regarded as having a substantially limiting impairment if the individual (1) has an impairment which is not substantially limiting but which the employer perceives as constituting a substantially limiting impairment; (2) has an impairment which is substantially limiting only because of the attitudes of others toward such an impairment; or (3) has no impairment at all but is regarded by the employer as having a substantially limiting impairment." *Bridges v. City of Bossier*, 92 F.3d 329, 332 (5th Cir. 1996) (citing *Dutcher*, 53 F.3d at 727-28 n.19), *cert. denied*, 117 S.Ct. 770 (1997).

Whether Burch qualifies under the "regarded as" prong turns on whether the evidence supports such a finding under the first or third definition.[18]  Both definitions require Coca-Cola to have perceived Burch's alcoholism as substantially limiting when, in fact, it was not.  Burch does not argue that Coca-Cola regarded his alcoholism as disabling and such a finding is not supported by the record.  Coca-Cola unquestionably considered Burch to be an alcohol abuser and concedes that alcohol consumption may have induced the conduct for which it claimed Burch was fired.  Burch's testimony, and that of Dr. Nace, would also support a jury finding that Coca-Cola regarded Burch as suffering from alcoholism, as that condition was defined at trial.  But, as in our discussion of

---

[18]    The record evidence does not show that negative reactions by others toward known alcoholics substantially limited Burch in any manner.  Dr. Nace testified only that a "skidrow image" of alcoholics has persisted.  There was no evidence suggesting that Coca-Cola employees embraced this view and we will not presume that its prevalence is so pervasive.

34

actual disabilities, we do find the evidence insufficient to support a finding that Coca-Cola regarded Burch as anything other than what he actually was: an alcoholic whose alcoholism did not substantially impair any major life activity, including the major life activity of working.

We find guidance in our recent decision in *City of Bossier*. In *City of Bossier*, we held that, in order for an employer to have regarded an impairment as substantially limiting in the activity of working, the employer must regard an individual as significantly restricted in the ability to perform a class or a broad range of jobs. 92 F.3d at 332. Burch produced no evidence that Coca-Cola regarded him to be so limited.

Coca-Cola may have been concerned about Burch's acknowledged "inappropriate" behavior, about his short temper, and about a specific instance of off-hour conduct, but Burch offered no evidence that demonstrates Coca-Cola regarded his alcoholism as substantially limiting his ability to work or his other major life activities. The record demonstrates that Coca-Cola was aware of the favorable letters submitted by Drs. Nace and Matamoros at the time of the termination decision. There was no evidence suggesting that Coca-Cola either discredited Burch's physicians' view that Burch's alcoholism would not affect his prospective ability to refrain from inappropriate conduct or that its managers premised their decision on such a position. But, significantly, even if Coca-Cola had considered Burch's alcoholism as an impediment to his position with the company, that would not end our inquiry. Coca-

35

Cola must have understood Burch's alcoholism to preclude employment in an *entire class of jobs*. Assuming Coca-Cola regarded his alcoholism as precluding employment as an area service manager with direct reporting authority over approximately twenty employees and a wide geographic area, such a conclusion falls far short of the standard set forth in *City of Bossier. Id.* at 334 (finding that an impairment that precluded employment in any position "involving routine exposure to extreme trauma" precluded only a "narrow range of jobs"); *see also Wooten v. Farmland Foods*, 58 F.3d 382, 386 (8th Cir. 1995) ("restrictions against working with meat products in a cold environment . . . only appeared to prevent [plaintiff] from performing a narrow range of meatpacking jobs"). The record is silent as to any conception, or misconception, held by Coca-Cola that alcoholism, alone, renders an alcoholic employee substantially impaired. Indeed, the fact that Coca-Cola had in place an employee assistance program designed to assist employees who may be experiencing problems with alcohol through referrals and counseling weighs in favor of the opposite conclusion.

As there was insufficient evidence to establish that Coca-Cola regarded Burch as disabled, and because Burch did not otherwise establish that he met the statutory definition of disabled, we hold that Burch failed to meet the *prima facie* elements of intentional discrimination under the ADA. Coca-Cola's motion for judgment as a matter of law was properly granted on Burch's intentional discrimination claim.

III. Defamation

Burch appeals the magistrate judge's grant of summary judgment in favor of Coca-Cola on his Texas law defamation claim. Burch argues that two statements by Coca-Cola were defamatory. The first was a statement by Charles Rose, an employee in Coca-Cola's human resources department, to Drake, Beam & Morin to the effect that Burch had been terminated for violent and threatening behavior. The second, from Cutshall to Smith, communicated a somewhat similar message. The magistrate judge granted summary judgment on the ground that these statements were opinion and, as such, were not actionable under Texas law. Memorandum Order at 1 (N.D. Tex. Jun. 7, 1995) (citing *Schauer v. Memorial Care Sys.*, 856 S.W.2d 437, 446 (Tex. App.--Houston 1993, no writ)).

Coca-Cola argues that summary judgment was appropriate because both statements were opinion and, alternatively, that Rose's statement to Drake, Beam & Morin was protected by the common interest privilege. Burch argues that any privilege that Coca-Cola might have had concerning the statements made to Drake was waived by Cutshall's statement to Smith, who was no longer affiliated with Coca-Cola at the time the statement was made.

Finding the statement from Rose to Drake, Beam & Morin protected by the common interest privilege, and finding that the statement from Cutshall to Smith does not support a defamatory meaning, we find no error in the magistrate judge's grant of summary judgment in favor of Coca-Cola.

"Slander is a defamatory statement orally communicated or published to a third person without legal excuse." *Halbert v. City*

37

*of Sherman*, 33 F.3d 526, 530 (5th Cir. 1994); *Randall's Food Mkts, Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). "Accusations or comments about an employee by his employer, made to a person having an interest or duty in the matter to which the communication relates, have a qualified privilege." *ContiCommidity Servs., Inc. v. Ragan*, 63 F.3d 438, 442 (5th Cir. 1995) (citing *Schauer*, 856 S.W.2d at 449), *cert. denied*, 116 S.Ct. 1318 (1996). This privilege extends to statements made in good faith by a former employer to a prospective employer, *see Pioneer Concrete of Texas, Inc. v. Allen*, 858 S.W.2d 47, 49 (Tex. App.--Houston 1993, writ denied), and those made to agencies engaged in placement services, *id.* at 50. The privilege can be defeated by showing actual malice or an abuse of the privilege. *ContiCommodity*, 63 F.3d at 442; *Randall's*, 891 S.W.2d at 646.

Burch argues that, although *Pioneer* held that statements made to placement agencies are covered by the conditional privilege, Rose's statement was not privileged because Drake, Beam & Morin was not a *placement* firm but rather a firm specializing in employment *counseling*. We find the distinction insufficient to defeat the privilege.

The privilege described in *Pioneer* was nothing more than a practical application of Texas's common-interest privilege, which recognizes that public or private interests in the availability of correct information can be of sufficient importance to require protection of the honest communication of misinformation. *Pioneer*, 858 S.W.2d at 50 (citing *Kaplan v. Goodfried*, 497 S.W.2d 101, 105

38

(Tex. App.--Dallas 1973, no writ)). Accordingly, voluntary communications, in addition to communications in response to a request, are privileged "'if the relationship between the parties is such that it is within generally accepted standards of decent conduct to furnish the information for the protection of the recipient.'" *Id.* (quoting *Kaplan*, 497 S.W.2d at 105-06).

The communication between Rose, a Coca-Cola human resources employee, and the offices of Drake, Beam & Morin were privileged under Texas's common-interest privilege. First, there was uncontroverted testimony that the standard practice for Drake Beam in particular, and among employment counseling firms in general, was to utilize the reasons for an employee's termination to aid in that employee's employment counseling preparation. Second, there was no evidence suggesting that Rose acted with any purpose other than to assist Burch's search for subsequent employment.[19]

---

[19]    Rose testified:

"Q.   Was it your practice to tell the out-placement service the reason for an employee's termination?
A.    Yes.
Q.    Why is that?
A.    There is actually a number of reasons, but the main reason is that it helps the out-placement service do a better job counseling the employee to find their [sic] next job.

.  .  .  .

Q.    Tell me how it would help Mr. Burch for Drake Beam & Morin to know that Coca-Cola had terminated him for violent and threatening behavior?
A.    A couple of different ways. Drake Beam has a number of different kinds of counselors available to them. It would help them select the person—the person best qualified and best suited to help him from their staff. And secondly, they need to coach their clients on how to

Accordingly, we hold that the statements made by Rose to Drake Beam were privileged and that Burch failed to establish that Rose, acting on behalf of Coca-Cola, acted with actual malice so as to defeat the privileged nature of the statements.[20]

---

answer questions when they get into an interview situation.

. . . .

Q.   Have you ever given that type of information about why an employee was discharged to Drake Beam in the past?
A.   Yes.
Q.   And relating to other employees?
A.   Yes.
Q.   Have you provided similar information to other out-placement counseling firms other than Drake Beam in other cases?
A.   Yes.
Q.   In your experience, is that the type of information that Drake Beam wanted to have?
A.   Yes.

. . . .

Q.   And why is that?
A.   When I am on the phone with Drake Beam, they ask me why a person has been terminated."

Rose's affidavit stated:

"The information I provided to Drake Beam was of the type customarily provided to an outplacement firm, and was necessary to enable Drake Beam to effectively provide its services to plaintiff.   In accordance with our established business relationship, this information was considered by Coca-Cola and Drake Beam to be strictly confidential."

[20]   "'Actual malice is not ill will; it is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true.'" *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 313 (5th Cir. 1995) (quoting *Carr v. Brasher*, 776 S.W.2d 567, 571 (Tex. 1989)).   The absence of an additional investigation as to the truth or falsity of a statement has been held insufficient to establish actual malice. *Id.* (citing *Shearson Lehman Hutton, Inc. v. Tucker*, 806 S.W.2d 914, 924 (Tex. App.--Corpus Christi 1991, writ dismissed w.o.j.)).

Burch also asserts that, even if Rose's communication was privileged, Cutshall's communication of similar information to Smith waived the privilege. We disagree. The common-interest privilege is not waived by an unrelated communication of similar information on a separate occasion to a former employee who may be asked to provide a recommendation.

The conditional, common-interest privilege "remains intact as long as communications pass only to persons having an interest or duty in the matter to which the communications relate." *Randall's*, 891 S.W.2d at 646; *Reeves v. Western Co. of N. Am.*, 867 S.W.2d 385, 394 (Tex. App.--San Antonio 1993, writ denied); *Perry Bros. Variety Stores, Inc. v. Layton*, 25 S.W.2d 310 (Tex. Comm'n App. 1930, judgm't adopted). Here, however, Burch does not contend that Rose's statement to Drake Beam was communicated, or overheard, by any person not covered by the privilege. Rather, Burch argues that a separate, second statement made on a different occasion, by a different person, and to a different person, communicated at a different time not established by the record, worked a waiver of the privilege that had attached to the statement to Drake Beam. Waiver occurs where the allegedly defamatory statement was made to those outside the interest group. This was not established. *See Mitre v. Brooks Fashion Stores, Inc.*, 840 S.W.2d 612, 619 (Tex. App.--1992, writ denied) (reversing summary judgment because whether a flyer accusing plaintiffs of passing counterfeit bills "was published only to shop employees, or also to the general public" was a fact issue relating to the privilege); *Layton*, 25

41

S.W.2d at 313 ("[T]he defamatory statements of Barr lost their privileged character by reason of the fact that same were made in a store open to the general public, and in the presence and hearing of customers who were there . . . and who had no interest in the subject matter of the statements."); *see also Danawala v. Houston Lighting & Power Co.*, 14 F.3d 251, 255 (5th Cir. 1993) (finding "secondary publications" by unauthorized gossip by co-workers did not waive the privilege).

Burch also contends that some time after he was terminated Cutshall defamed him in a telephone conversation with Smith, who was then employed by another company. The only evidence concerning this conversation is Cutshall's deposition testimony. Cutshall there stated he called Smith in order to obtain a favorable reference for Burch, believed that Smith asked him why Burch had been terminated, and that he told Smith "what had been relayed to me as to what had happened," that he did *not* recall saying Burch had engaged in "violent" behavior, but had "used the word threatening behavior, menacing behavior toward another employee." Nothing more is shown concerning what Cutshall said to Smith. Given the context of Cutshall's conversation, and the undisputed evidence that Burch, a physically imposing 6'5", 223 pounds, at the least had become visibly and obviously very angry at the meeting and mouthed hostile vulgarities to and pointed at a fellow employee there, gesturing with his head for the two of them to go outside, we conclude that this mere snippet of testimony from Cutshall's deposition does not suffice to establish that Cutshall falsely

defamed Burch.

Coca-Cola argues that "[i]t is well-settled Texas law that mere statements of opinion are protected as free speech and cannot form the basis of a cause of action for defamation." Burch argues that Coca-Cola's reading of Texas law relies on an abandoned adherence to *Gertz v. Robert Welch, Inc.*, 94 S.Ct. 2997 (1974), and that Texas now follows the view, expressed in *Milkovich v. Lorain Journal Co.*, 110 S.Ct. 2695 (1990), that statements of opinion may be actionable if they imply an assertion of objective fact. We find no inconsistency between the cases cited by Coca-Cola and those cited by Burch. Texas case law plainly protects those communications that are not objectifiably verifiable. *See Carr v. Brasher*, 776 S.W.2d 567; *Simmons v. Ware*, 920 S.W.2d 438 (Tex. App.--Amarillo 1996); *Schuller v. Swan*, 911 S.W.2d 396 (Tex. App.--Corpus Christi 1995); *Schauer*, 856 S.W.2d 437; *Shearson Lehman Hutton*, 806 S.W.2d 914; *Yiamouyiannis v. Thompson*, 764 S.W.2d 338 (Tex. App.--1988, writ denied), *cert. denied*, 110 S.Ct. 722 (1990).

"'A statement is defamatory if the words tend to injure a person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury.'" *McKethan v. Texas Farm Bureau*, 996 F.2d 734, 743 (5th Cir. 1993) (quoting *Einhorn v. LaChance*, 823 S.W.2d 405, 410-11 (Tex. App.--Houston 1992, writ dismissed w.o.j.) (holding statement that an employee was fired for reasons relating "solely to work performance" was not defamatory because it was nonspecific)), *cert. denied*, 114 S.Ct. 694 (1994). "'Whether the words are reasonably capable of the defamatory

43

meaning the plaintiff attributed to them is a question of law for the trial court.'" *Id.* (quoting *Kelly v. Diocese of Corpus Christi*, 832 S.W.2d 88, 91 (Tex. App.--Corpus Christi 1992, writ refused)). The allegedly defamatory statement must be considered in context and in light of the circumstances surrounding its publication. *Id.*

We hold that, given the uncontroverted purpose of the communication from Cutshall to Smith——to obtain a favorable recommendation for Burch——and the vague and general nature of the statement made, as well as Burch's admitted conduct at the meeting, Cutshall's statement was not falsely defamatory.

Cutshall testified that his remarks were made for the purpose of obtaining a favorable recommendation. There was no evidence that Cutshall provided any factual information to Smith other than characterizing the nature of Burch's termination. Cutshall testified that he told Smith "what had been relayed to me as to what had happened." Burch testified that Smith had reviewed his prior performance favorably in evaluations and was aware of Burch's professional ability. Given Cutshall's communicated purpose——to obtain a *favorable* recommendation——and in light of the circumstances surrounding the statement, we find that no reasonable jury could find that Cutshall's remarks rose to the level of actionable defamation under Texas law.

### Conclusion

For the foregoing reasons, we affirm the magistrate judge's grant of judgment as a matter of law on Burch's ADA intentional discrimination claim, affirm the grant of summary judgment on

44

Burch's defamation claim, and reverse the denial of Coca-Cola's motion for judgment as a matter of law on Burch's ADA reasonable accommodation claim.  Accordingly, the judgment of the trial court is REVERSED and the cause is REMANDED with instructions to enter judgment dismissing all of Burch's claims against Coca-Cola.

AFFIRMED in part; and REVERSED and REMANDED with instructions