**Marie–Therese LEICHT, Plaintiff,**

v.

**HAWAIIAN AIRLINES, INC., Defendant.**

**No. CIV. 98–00755 SOM.**

United States District Court, D. Hawaii.

Sept. 21, 1999.

---

Lunsford D. Phillips, Honolulu, HI, for plaintiff.

Sarah O. Wang, Marr Jones & Pepper, Honolulu, HI, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MOLLWAY, District Judge.

Plaintiff Marie–Therese Leicht ("Leicht") is suing her employer, Hawaiian Airlines, Inc. ("Hawaiian"). Leicht says that Hawaiian violated the Age Discrimination in Employment Act ("ADEA") and the Americans With Disabilities Act ("ADA") by permanently filling her former position when she was on an indefinite leave of absence undergoing treatment for lung cancer. She also claims that Hawaiian violated the ADA by allegedly failing to provide her with a comparable position when she returned to work. This alleged failure to provide her with either her former job or a comparable job is also the basis for Leicht's promissory estoppel claim. Hawaiian has moved for summary judgment.

This court grants Hawaiian's motion. Summary judgment is granted on the age discrimination claim because Leicht has not come forward with evidence creating a triable issue as to whether the nondiscriminatory reasons for not providing her with either her former job or a comparable job were a pretext for age discrimination. With respect to the ADA claim, the court recognizes that there are genuine issues of material fact as to whether Leicht is disabled. The court nevertheless grants summary judgment to Hawaiian on the ADA claim because Leicht has not met her burden of showing that, at the relevant times, she was able to perform the essential functions of the jobs she sought with or without reasonable accommodation. Finally, the court grants summary judgment on the promissory estoppel claim because there was no "promise" to provide Leicht with a job, and even if there had been, there is no evidence that Leicht detrimentally relied on such a promise.[1]

## BACKGROUND

In September 1996, Leicht, then 49 years old, was hired by Hawaiian to fill the newly created position of Director of Procedures and Training in the Customer Service Department. *See* Deposition of Marie–Therese Leicht ("Leicht Depo.") at 38–39 attached as Exhibit A to Defendant's Concise Statement of Facts. Her direct supervisor, Guy Hall, the Acting Vice President of Customer Service as of August 1997, was "about the same age as [Leicht]." *Id.* at 191.

In mid-October 1996, Leicht had a heart attack and underwent an angioplasty to open a blocked artery. *Id.* at 51–53. Leicht was out of work for two weeks, during which time Hawaiian paid her full salary. *Id.* at 54. Thereafter, Leicht worked reduced hours until she was able to return to normal work hours. *Id.* at 54–55.

In late August 1997, Leicht was diagnosed with lung cancer. *Id.* at 56–57. She was told she "had a couple of months to live" and less than a 1 percent chance of survival. *Id.* at 57–59.

On the day Leicht was diagnosed, she notified Hall of her diagnosis and prognosis and requested an immediate leave of absence. Hawaiian granted Leicht's request. *Id.* at 61–62. Leicht could not estimate a return-to-work date. *Id.* at 66–67, 178.

---

1. Hawaiian also moved for summary judgment on Leicht's Family and Medical Leave Act ("FMLA") claim. In her opposition to the motion for summary judgment, Leicht said she was withdrawing her FMLA claim. No stipulation for partial dismissal or other paper reflecting the "withdrawal" having been submitted to the court, the court is treating the statement in the opposition memorandum as Leicht's motion to dismiss the FMLA claim. That claim is hereby dismissed with prejudice.

Leicht began her leave of absence by using her sick leave and vacation. After those days were exhausted, Hawaiian kept her on the payroll at full pay for almost three additional months, even though she was not working. Leicht was not eligible for temporary disability insurance benefits, but the additional three months on the payroll enabled her to qualify for benefits under Hawaiian's long-term disability plan. *Id.* at 107; Deposition of Michael Conroy ("Conroy Depo.") at 28–29, attached as Exhibit C to Defendant's Concise Statement of Facts.

In September 1997, Leicht went to Seattle for chemotherapy and radiation treatment. Leicht Depo. at 90–92. Hawaiian's Seattle station manager, Tim Hazel, had told Leicht about the Swedish Tumor Institute in Seattle and arranged for her to be seen at that facility. Hazel "literally opened up his home" to Leicht, allowing her to stay with him and assisting her during her treatment in Seattle. *Id.* at 60–61, 86–87, 90.

In mid-September 1997, Leicht's position as Director of Procedures and Training was posted as vacant, and a replacement was sought on a temporary basis. Deposition of Guy Hall ("Hall Depo.") at 38–39, attached as Exhibit B to Defendant's Concise Statement of Facts. According to Hall, it was necessary to fill the position permanently from an operational standpoint, and it had always been his intent to do so. *Id.* at 39–41, 44, 55. Hall had told Leicht at the outset that he was going to post her position as vacant and seek a permanent replacement because "[w]e need someone to fill the job." Leicht Depo. at 95.

Hall, as the department head, recommended Tyson Tajiri for the position. Hall Depo. at 47. According to Hall, Tajiri was already a member of the Customer Service Department and was "best suited to take on that position and direct it in a positive manner." *Id.* at 48. Hall says he was impressed by Tajiri's organizational skills, demeanor, willingness, and energy. *Id.* Tajiri assumed the Director position on

a temporary basis on November 1, 1997. Deposition of Tyson Tajiri ("Tajiri Depo.") at 14, attached as Exhibit E to Defendant's Concise Statement of Facts. He was twenty-four years old at the time.

In mid-November 1997, after the first round of chemotherapy and radiation treatment, Leicht returned to Hawaii for three weeks to recuperate. Leicht Depo. at 92. She was met at the airport by a number of Hawaiian employees, including Hall and Michael Conroy, the then-Vice President of Human Resources. *Id.* at 100–02 (attached as Exhibit E to Plaintiff's Memo. in Opp.). Leicht says Conroy told her that Hawaiian would have to provide her with either her old job or a job comparable in title and salary if she was able to return to work. *Id.* at 105–06. At that time, Leicht's "prognosis was still up in the air," and she did not know if she would ever be able to return to work. *Id.* at 93, 107. For his part, Conroy does not recall the details of the conversation, other than that it included an exchange of pleasantries. Conroy Depo. at 11–13.

In early December 1997, Leicht returned to Seattle to assess the results of the first round of treatment. Leicht Depo. at 92, 115–16. On December 23, 1997, Leicht learned that tests showed no evidence of malignancy. *Id.* at 116–17. However, because of the possibility that there were still some cancer cells in her body, Leicht was encouraged to undergo another round of chemotherapy, which would last about four months. *Id.* at 118–19.

The next day, on December 24, Leicht called Hall and told him that she appeared to be in remission but would have to undergo another round of chemotherapy. *Id.* at 120–21. Leicht did not give Hall a return-to-work date. *Id.* at 122. She said, "hopefully, [she] would be back in May." *Id.* at 121.

During that December 24 telephone conversation, Leicht cannot recall whether Hall said that Leicht would have her former job back or that she would have "a

job" if she returned. *Id.* at 124. She knows that he said, "[W]e are looking forward to seeing you come back to work." *Id.* Hall does not recall discussing the issue during the December 24 telephone conversation but does admit that, at some point, he told Leicht that, if she were able to return to work, there would be "a job" for her at Hawaiian. Hall Depo. at 38–40, 56–57, 60. According to Hall, it was never his understanding, and he did not convey to Leicht, that she would necessarily get her former job back. *Id.*

Leicht began a second round of chemotherapy, mostly on an out-patient basis, at the end of December 1997. Leicht Depo. at 131, 135. Leicht says she "was significantly restricted in breathing, standing, walking, sleeping, and all physical activities." [2] Declaration of Marie–Therese Leicht ("Leicht Dec.") ¶ 24. However, Leicht was able to tolerate the chemotherapy "pretty well" and was able to do such things as care for herself, eat, shop, and drive. Leicht Depo. at 136–37.

In mid-January 1998, in the midst of her second round of treatment, Leicht sent Conroy a letter thanking him for his support and requesting his assistance in publishing an open letter to all Hawaiian employees in the company newsletter. *Id.* at 128–29. The draft version of the letter states, "It definitely looks as though I will be able to return to work in a few months." *Id.* at 131. The draft was not actually sent to Hawaiian, and the final version of the letter, which is the only one Leicht says she sent, has not been produced by either party. Leicht does not recall whether the final version contained identical language. *Id.* at 131–33. She believes it may have stated that she "hope[d] to be back to work in May." *Id.* at 132–33. The draft letter also states, "I look forward to returning to work soon." *Id.* at 133. Leicht says that she thinks the final version of the letter contained this language.[3] *Id.*

On February 19, 1998, Hawaiian permanently filled Leicht's former Director of Procedures and Training position. According to Hall, the temporary position filled by Tajiri needed to be converted to a permanent position to keep Hawaiian's "business going on a day-to-day [basis]"; "to maintain the organization, the training

---

**2.** Leicht's doctor, Gary Goodman, also says that, until March 1998, Leicht "was substantially impaired, compared to a healthy adult, in a variety of life functions, for example in her breathing and sleeping, in her ability to keep food down as well as in being able to physically exert herself." Declaration of Gary E. Goodman, M.D. ("Goodman Dec.") ¶ 5.

In his declaration at ¶ 7, Goodman says that Leicht "has been troubled by severe shortness of breath during the period of *intensive* treatment. At times even minimal physical exertion, such as walking twenty-five yards, exhausted her. Like her neuropathy the problems of weakness and shortness of breath have abated somewhat since the end of *intensive* treatment." Goodman Dec. ¶ 7 (emphasis added). These allegations are unfortunately not connected to a specific time frame. It is unclear whether Goodman's reference to Leicht's "intensive" treatment relates to the first round of chemotherapy and radiation in 1997, rather than to the precautionary second round of chemotherapy in 1998.

**3.** In her memorandum in opposition to Hawaiian's motion for summary judgment, Leicht claims that "she clearly indicated her plans to return. It is possible she even gave a specific return to work date of May 1st. At the very least she indicated she would definitely be returning to work in a few months." The evidence cited by Leicht does not support these statements. The evidence instead indicates that Leicht did not give Hawaiian a definite return-to-work date. At best, Leicht indicated her hope that she would be returning to work after the second round of chemotherapy was completed. Leicht's declaration states that Leicht made a more definite statement about returning to work than indicated in her deposition. However, at the hearing on the present motion, Leicht stated that she was aware that deposition testimony could not be varied by a later declaration submitted in opposition to a summary judgment motion. Leicht said she had not intended to vary her deposition testimony and would stand on it rather than on her declaration to the extent the two varied. The court therefore bases its review on Leicht's deposition with respect to her statements to Hawaiian in early 1998 about when she would return to work.

organization, in some form of operating efficiency"; and to give Tajiri the "credibility to be able to move the training department forward." *Id.* at 39, 41, 44.

Leicht's second round of chemotherapy ended in March 1998. In early April, Leicht's doctors released her from further treatment. Leicht Depo. at 135–36. At that time, Leicht was able to do "sedentary" tasks. Leicht Dec. ¶ 25. According to Leicht, her mental stamina was not greatly affected, but she was unable to "stand for more than a few minutes without a great deal of pain." Leicht Dec. ¶¶ 24–25. ("[i]t [was] actually less painful to walk than stand for some reason"). Leicht was doing volunteer office work and was maintaining a "regular work schedule, doing volunteer work and looking for another job." *Id.* ¶ 25.

In April 1998, Leicht left a telephone message for Conroy's successor, Ruthann Yamanaka, saying that she was returning to Hawaii and asking for a meeting to discuss a return-to-work date. Leicht Depo. at 143. Yamanaka, having joined Hawaiian in March 1998, was unaware of Leicht's situation when she met with Leicht in mid-April 1998. Yamanaka therefore had no understanding before the meeting of Leicht's purpose in requesting the meeting, other than what was in Leicht's message. Deposition of Ruthann Yamanaka ("Yamanaka Depo.") at 18, 20–23, attached as Exhibit H to Defendant's Concise Statement of Facts. During the meeting, Leicht explained her circumstances, including her recent medical history and her desire to return to the position of Director of Procedures and Training ("Director position") on May 1, 1998. *Id.* at 24–26; Leicht Depo. at 146–47.

Following the meeting, Yamanaka sought to learn more about Leicht's situation, the circumstances of her leave, and the status of the Director position. Yamanaka Depo. at 26–28, 35–36. Yamanaka then told Leicht that Yamanaka had learned that Tajiri had been placed in the Director position on a permanent basis. *Id.* at 42–43, 45; Leicht Depo. at 147.

In June 1998, Hawaiian telephoned Leicht and offered her the position of Manager, Customer Service Training ("Manager position"). Yamanaka Depo. at 64. The position was an entry-level management position directly below Leicht's former mid-level management position as Director. *Id.;* Deposition of Marlene Figueroa ("Figueroa Depo.") at 45, attached as Exhibit I to Defendant's Concise Statement of Facts; Leicht Depo. at 152–53, 155–56. The Manager position appeared to fall within Leicht's area of interest and expertise.

Leicht was insulted by the offer, conveyed this feeling to Hawaiian, and refused the Manager position. Leicht Depo. at 152; Figueroa Depo. at 46–47. It appeared to Hawaiian that Leicht expected to regain her former job as Director of Procedures and Training. Figueroa Depo. at 46–47.

Leicht says she refused the Manager position because she was unqualified for it and physically incapable of performing its duties. In a letter to Hawaiian dated July 13, 1998, Leicht said she was unqualified for the position because it required her to use Sabre, Hawaiian's computer system. *See* Exhibit 15, attached to Plaintiff's Memo. in Opp. to Defendant's Motion for Summary Judgment. She also said she was unqualified because she lacked forklift training and jetbridge training certification. *Id.* According to Leicht, she "no longer [has] these qualifications and it would take at least a year to regain this knowledge." *Id.* Leicht also said she was physically incapable of performing in the position because it required that she conduct classroom training and she could only stand for short periods and walk short distances. *Id.*

Leicht did not ask for details of the offer of the Manager position. Leicht simply refused the offer. She did not discuss the salary or scope of responsibilities or request that the job title be changed. Leicht Depo. at 153–55. Hawaiian says that it intended to pay Leicht the same salary

that Leicht had previously earned in the Director position, and that it was willing to discuss modifications to the scope of responsibilities that went with the Manager position. Hawaiian says, however, that Leicht's unequivocal rejection foreclosed any discussion of those matters. Yamanaka Depo. at 65, 69–72; Figueroa Depo. at 45–47.

In July 1998, Leicht learned of an anticipated vacancy in the Director of Security and Security Systems position. Leicht applied for but was not hired for that position. Leicht Dec. ¶ 22.

Leicht is not now on Hawaiian's payroll, but she receives medical and dental benefits and group life and accidental death and dismemberment insurance coverage. Declaration of Aileen Nonaka ("Nonaka Dec."), attached as Exhibit 1 to Defendant's Reply.

On September 15, 1998, Leicht filed the Complaint in this action. She alleged claims under the ADA, the ADEA, and the FMLA relating to Hawaiian's decision to fill her former position on a permanent basis while she was on an indefinite leave of absence and Hawaiian's alleged failure to place her in a comparable position when she was able to return to work. On March 29, 1999, Leicht filed a First Amended Complaint identical to the original Complaint except for the addition of a promissory estoppel claim.

On July 1, 1999, Hawaiian moved for summary judgment on all claims.[4]

## STANDARD

Summary judgment shall be granted when

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

FED. R. CIV. P. 56(c). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Summary judgment must be granted against a party who fails to demonstrate facts to establish what will be an essential element at trial. *Id.* at 322, 106 S.Ct. 2548. The burden initially lies with the moving party to identify for the court "the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show

---

4. In opposing the motion for summary judgment, Leicht filed a 29–page opposition, in space-and-a-half format, with 6 additional pages of endnotes. Leicht violated Local Rules 7.5 and 10.2, which require that an opposition be double-spaced and not exceed 30 pages in length. Hawaiian asks that the opposition be disregarded as a sanction under L.R. 11.1 for Leicht's failure to comply with the Local Rules. The court is concerned that Leicht's opposition was filed in violation of the length requirement despite specific notice from the court to Leicht's counsel that the Local Rules would be enforced. Leicht's counsel had contacted court staff to determine whether a 33–page opposition in double-spaced format was preferred to a 40–page opposition in space-and-a-half format. The court staff's only response to Leicht's counsel

was that the opposition would have to conform to the requirements of the Local Rules. Nevertheless, the court denies Hawaiian's request to disregard Leicht's opposition. Especially given the court's ruling, Hawaiian has not been prejudiced. The court cautions Leicht's counsel that future violations of court rules are likely to result in the imposition of significant sanctions. The court notes further that Hawaiian, for its part, appears to have violated L.R. 10.2(a), which requires that papers filed with the court be in a type size "which is either (i) not more than 10 characters per linear inch, e.g., pica, for fixed space type, or (ii) not more than 12 characters per linear inch, e.g., elite, for proportional spaced fonts." Hawaiian's footnotes appear to be in a smaller type size.

that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted). The nonmoving party may not rely on the mere allegations in the pleadings and instead must set forth "specific facts showing that there is a genuine issue for trial." *Id.* At least some " 'significant probative evidence tending to support the complaint' " must be produced. *Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir.1997) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987) (*citing Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587, 106 S.Ct. 1348), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

However, when "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec. Serv.*, 809 F.2d at 631. All evidence and inferences must be construed in the light most favorable to the nonmoving party. *Id.* Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. *Id.*

## DISCUSSION

### I. *Age Discrimination in Employment Act ("ADEA")*

Leicht alleges that Hawaiian discriminated against her because of her age when it permanently filled her former position as Director of Procedures and Training. Hawaiian allegedly knew of Leicht's imminent return when it permanently filled the posi-tion. Summary judgment is appropriate on Leicht's age discrimination claim because Leicht was unable to perform the duties of the position and because, even if she was able, there is no evidence that the decision to fill the Director position on a permanent basis was motivated by an intent to discriminate based on age.

### A. *Leicht Has Not Made A Prima Facie Showing Of Age Discrimination.*

■ The ADEA, 29 U.S.C. §§ 621–634, forbids an employer from discriminating against employees over the age of forty on account of age. *See* 29 U.S.C. §§ 623, 631. Absent direct evidence of discrimination, age discrimination claims are subject to the same burden-shifting analysis articulated for race discrimination claims in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 888–89 (9th Cir.1994).

Under *McDonnell Douglas*, the plaintiff has the initial burden of establishing a prima facie case of discrimination and must prove that: (1) she was a member of a protected class; (2) she was performing her job in a satisfactory manner; (3) she suffered an adverse employment action; and (4) she was replaced by a substantially younger employee with equal or inferior qualifications. *See id.* at 891. A prima face case "in effect creates a presumption that the employer unlawfully discriminated against the employee." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

■ Leicht was a member of a protected class. She was 49 years old when she was hired in 1996 and 51 years old when the Director position was permanently filled. Persons between the ages of 40 and 70 are protected by the ADEA. *Wallis*, 26 F.3d at 891. She arguably suffered an adverse employment action when the person temporarily filling her position while she was on leave of absence was given the job on a permanent basis. The person

who replaced Leicht as Director of Procedures and Training, Tyson Tajiri, was younger (24 years old) and arguably less qualified than Leicht.

However, Leicht has not met her burden of showing that she was performing her job in a satisfactory manner when the Director of Procedures and Training position was filled on a permanent basis. There is no dispute that, at the time the Director position was permanently filled, Leicht was on medical leave undergoing chemotherapy treatment. She was not performing her job at all, let alone in a satisfactory manner. Thus, Leicht has not made a prima facie showing of age discrimination.

B. *Leicht Has Not Shown That The Nondiscriminatory Reasons For Permanently Filling The Director Position Were a Pretext For Discrimination.*

██ Even assuming Leicht had established a prima facie case of age discrimination, summary judgment would still be appropriate because Leicht has not met her burden of showing that Hawaiian's nondiscriminatory reasons for permanently filling Leicht's position were a pretext for age discrimination.

Once a plaintiff establishes a prima face case of discrimination, the burden then shifts to the employer to show a legitimate, nondiscriminatory reason for its employment decision. *See McDonnell–Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 917 (9th Cir.), *cert. denied*, 522 U.S. 950, 118 S.Ct. 369, 139 L.Ed.2d 287 (1997). "Once the employer meets this burden, the presumption of discrimination drops away." *Nidds*, 113 F.3d at 917. The burden then shifts back to the plaintiff to show that the employer's stated reason is pretextual. *Id.* at 918. The ultimate burden of persuading the trier of fact remains at all times with the plaintiff. *See St. Mary's Honor Ctr.*, 509 U.S. at 508, 113 S.Ct. 2742.

Hawaiian says that the Director of Procedures and Training position was made permanent because it was a burden on the department to continue to fill the position on a temporary basis. According to Vice President Hall, the position needed to be filled on a permanent basis to keep Hawaiian's "business going on a day-to-day [basis]" and "to maintain the organization, training organization, in some form of operating efficiency." Hall Depo. at 39, 41. Hall said Tajiri needed to be given the "credibility to be able to move the training department forward." *Id.* at 44.

Once Hawaiian articulates a nondiscriminatory reason for the adverse employment action, the burden shifts back to Leicht to show that Hawaiian's reason was merely a pretext for discrimination. Pretext may be proven " 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir.1998) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

"When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Id.* at 1221. The direct evidence need only be "very little" to withstand a motion for summary judgment. *Id.*

" 'Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption.' " *Godwin*, 150 F.3d at 1221 (quoting *Davis v. Chevron, U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir.1994)). Leicht argues that she has direct evidence that Hawaiian discriminated against her because of her age. She notes that Hall, who recommended that Tajiri permanently fill the Director of Procedures and Training position, was asked in his deposition, "When you first got to know him, what impression

did he make?" Hall answered, "Well, you know, obviously, he was very young, but he seemed to be eager to work for the department." Hall Depo. at 44. This is not evidence of discrimination at all. Hall was merely stating his impression of Tajiri when he first met him. Hall testified to the fact that Tajiri was young, not that Tajiri was hired because he was young. At most, Hall's statement was a "stray remark" that was "uttered in an ambivalent manner and [was] not tied directly" to the adverse employment action. *See Godwin,* 150 F.3d at 1222. *See, e.g., Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1438–39 (9th Cir.1990) (one comment by an executive for employer that he chose one candidate over another because he was "a bright, intelligent, knowledgeable young man" was insufficient to show age discrimination). *See also Nidds,* 113 F.3d at 918–19 (employer's "old timers" comment was ambiguous and not tied to employee's termination and thus was insufficient to establish age discrimination); *Nesbit v. Pepsico, Inc.,* 994 F.2d 703, 705 (9th Cir.1993) (supervisor's statement that "[w]e don't necessarily like grey hair" in age discrimination suit was ambivalent and was not directly tied to plaintiff's termination). Hall's remark concerned Hall's impression at the time Tajiri was initially hired, not at the time Tajiri filled the Director position, either on a temporary or on a permanent basis.

Hall's further deposition testimony puts his remark into context:

Q  [by Leicht's attorney]: Why was Mr. Tajiri promoted over three directors including the director of reservations?

A [by Hall]: Because Tyson was best suited to take on that position and direct it in a positive manner after everything was evaluated.

Q: Okay. What made him the best suited?

A: A number of issues.

Q: Such as?

A: Such as his organizational skills. Such as his demeanor and positive direction toward achieving a new, good-look face on the training department. A lot of different elements, but basically his organizational willingness, energy. You name it. He came out ahead.

Q: So you were impressed by his youthful enthusiasm and energy?

. . . .

A: Would you repeat that, please.

Q: I'm correct in assuming that you were impressed by his youthful enthusiasm and energy?

. . . .

A: No, no. I liked his energy. I liked his organizational skills. I liked his potential in achieving the job. But certainly not as you are trying to describe it, no.

Thus, the court finds that Leicht has not shown direct evidence of pretext.

The court's inquiry does not, of course, end there. When direct evidence is unavailable, the "plaintiff may come forward with circumstantial evidence that tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable." *Godwin,* 150 F.3d at 1222. "Such evidence of 'pretense' must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate on the basis of [age]." *Id.*

Leicht says that Tajiri was less qualified for the Director position than both she and other applicants for the position. She argues that she was paid more than Tajiri in the same Director position and that she was more successful in that position than Tajiri was. She says that Hawaiian did not tell other members of the department of the decision to fill the position permanently and that the reasons Hawaiian has given for permanently filling the position were implausible.

These allegations do not constitute the "specific" and "substantial" evidence of pretext needed to defeat summary judgment. None of the evidence offered by Leicht suggests that Hawaiian permanent-

ly filled the Director position because Leicht was older and commanded a higher salary.

Leicht's opinion that Tajiri was not the best-qualified applicant is evidence only that Hawaiian may have made a bad decision, not that Hawaiian was biased against older workers.

Leicht herself was a recent hire. She was hired in September 1996 when she was 49 years old. The fact that she was hired at that age suggests that Hawaiian was not biased against older workers. *See Suttell v. Manufacturers Hanover Trust Co.,* 793 F.Supp. 70, 74 (S.D.N.Y.1992) (the fact that plaintiff "was hired by the Bank at the age of fifty-six ... undercuts any inference of age discrimination"); *Zaleski v. Customized Transp., Inc.,* No. 90–CV–40252–FL, 1991 WL 353847, *2 (E.D.Mich. May 2, 1991) (plaintiff's hire, at age 51, "on its face rebuts any presumption of age discrimination by defendant"). The decision to fill the Director position permanently was made just a year and a half after Leicht's hire in February 1998. Moreover, Hall, the person who recommended that the position be permanently filled, is about the same age as Leicht. When the decisionmaker is close in age to the plaintiff and is also within the protected category, the inference of discrimination is diminished. *See Fairchild v. Forma Scientific, Inc.,* 147 F.3d 567, 572 (7th Cir.1998). Against this background, Leicht does not offer indirect evidence of pretext.

The suggestion that Hawaiian permanently replaced Leicht because of the pay she commanded at her age is unsupported by any evidence. To the contrary, Hawaiian intended to offer Leicht comparable pay in a different position, so Hawaiian was not motivated by a wish to cut the personnel costs associated with an older employee. Yamanaka Depo. at 64–65, 70–72.

Finally, even if other members of the department were unaware that the Director position was being permanently filled, Leicht offers no evidence that Hawaiian attempted to keep the decision a secret. Even if Leicht had such evidence, she makes no showing that the alleged "secrecy" was connected in any way to any purpose at all, let alone age discrimination.

Based on all of the foregoing, the court grants summary judgment on the ADEA claim.

## II. *Americans With Disabilities Act ("ADA")*

Hawaiian has also moved for summary judgment on Leicht's ADA claim, arguing that Leicht was not disabled and that, even if she was, Hawaiian reasonably accommodated her disability. There is a genuine factual dispute on the issue of whether Leicht was disabled, but the court grants summary judgment on the ADA claim because there is no evidence that, even if Leicht was disabled, she was qualified at the relevant times to perform, with or without reasonable accommodation, the essential duties of the jobs she sought.

The ADA was enacted to eliminate barriers that prevent disabled individuals from fully participating in society. *Kirkingburg v. Albertson's Inc.,* 143 F.3d 1228, 1231 (9th Cir.1998), *rev'd on other grounds,* —— U.S. ——, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999). "The ADA contemplates that a person with a disability will be evaluated on the basis of his individual capabilities" rather than on "society's biases or an employer's preconceptions." *Id.* Thus, the ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual." *Id.; see* 42 U.S.C. § 12112(a). *Accord Bradley v. Harcourt, Brace and Co.,* 104 F.3d 267, 271 (9th Cir.1996).

█ To establish a prima facie case of disability discrimination, a plaintiff has the burden of establishing that "(1) he or she is a disabled person within the meaning of the ADA, (2) he or she is able to perform the essential functions of the job with or without reasonable accommodation, and (3)

he or she suffered an adverse employment decision because of his or her disability." *Barnett v. U.S. Air, Inc.,* 157 F.3d 744, 748 (9th Cir.1998). *See also Bradley,* 104 F.3d at 271; *Sanders v. Arneson Prod., Inc.,* 91 F.3d 1351, 1353 (9th Cir.1996) ("to state a prima facie case under the ADA, a plaintiff must prove that he is a qualified individual with a disability who suffered an adverse employment action because of his disability"), *cert. denied,* 520 U.S. 1116, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997).

### A. There Is A Genuine Issue of Material Fact As To Whether Leicht Was Disabled Under the ADA.

■ To be protected by the ADA, Leicht must first demonstrate that she was disabled within the meaning of the ADA. "Disability" is a term of art. A "disability" is: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Thompson v. Holy Family Hosp.,* 121 F.3d 537, 539 (9th Cir. 1997) (citing 42 U.S.C. § 12102(2)). Leicht claims that her heart condition and her lung cancer were disabilities under the ADA.

### 1. There Is A Genuine Issue Of Material Fact As To Whether Leicht Had An Impairment That Substantially Limited A Major Life Activity.

Under the ADA, a person is disabled if she has a physical or mental impairment that substantially limits a major life activity. The Supreme Court has articulated a three-step analysis for determining whether an individual is disabled under the ADA. First, a court must determine whether the plaintiff has an impairment. *See Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540 (1998). Cancer qualifies as an impairment under the ADA. *See Ellison v. Software Spectrum, Inc.,* 85 F.3d 187, 190 (5th Cir.1996); *Bizelli v. Amchem,* 981 F.Supp. 1254, 1257 (E.D.Mo.1997) ("[t]here is no dispute that cancer can constitute a physical impair-

ment under the ADA"); *see also Bragdon,* 118 S.Ct. at 2202 ("a disability includes such diseases and conditions as orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, and ... drug addiction and alcoholism").

Second, the court must identify the life activity that a plaintiff says is affected and determine whether it constitutes a major life activity under the ADA. *See Bragdon,* 118 S.Ct. at 2202. Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Leicht claims that she "was significantly restricted in breathing, standing, walking, sleeping, and all physical activities." Leicht Dec. at 24.

Finally, the court must determine whether the impairment substantially limits Leicht's asserted major life activities. *See Bragdon,* 118 S.Ct. at 2202. An impairment "substantially limits" a major life activity when the individual is: (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1) (1995); *see also Thompson,* 121 F.3d at 539–40.

Section 1630.2(j)(2) lists three factors to consider in determining whether an individual is substantially limited in a major life activity: "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii). The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *See also Sanders,* 91 F.3d at 1354.

▮ Whether an impairment is substantially limiting is measured at the time of the requested accommodation. *Burch v. Coca–Cola Co.,* 119 F.3d 305, 315 (5th Cir. 1997), *cert. denied,* 522 U.S. 1084, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998); *accord Roush v. Weastec, Inc.,* 96 F.3d 840, 844 (6th Cir.1996) (an employee's kidney condition did not substantially limit a major life activity when the employee had undergone a number of surgeries and medical procedures to correct her condition; although her ability to work while she was undergoing the procedure had been substantially limited, when her kidney was no longer obstructed her ability to work was no longer affected); *Pritchard v. Southern Co. Serv.,* 92 F.3d 1130, 1132 (11th Cir.), *amended on other grounds on reh'g,* 102 F.3d 1118 (11th Cir.1996), *cert. denied,* 520 U.S. 1274, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997). Thus, the court considers the extent to which Leicht's impairment substantially limited a major life activity at the time she requested an accommodation.

▮ Leicht requested an accommodation in April 1998, after she had completed chemotherapy and asked Ruthann Yamanaka for her old position back.[5] According to Leicht, her mental stamina had not been greatly affected. Leicht Dec. ¶ 25. The only apparent limitation was that she was unable to "stand for more than a few minutes without a great deal of pain."[6] *Id.* ¶ 24. Thus, she was able to do sedentary tasks. *Id.* ¶ 25.

The court finds a genuine issue of material fact as to whether Leicht was substantially limited in the major life activities of walking and standing. *See, e.g., Driesse v. Florida Bd. of Regents,* 26 F.Supp.2d 1328, 1335 (M.D.Fla.1998) (finding a question of fact as to whether plaintiff's inability to walk and stand after prostate surgery substantially limited the major life activity of walking or standing).

Leicht says that, during her second round of chemotherapy, after her cancer was in remission, she could care for herself, eat, go shopping, and drive. Leicht Depo. at 136–37. However, Leicht also said that she could not stand for more than a few minutes without experiencing pain. Leicht Dec. ¶ 24.[7] It is therefore unclear whether Leicht's abilities to walk and stand were "substantially limited."

Hawaiian argues that Leicht was at most disabled only from her cancer diagnosis in August 1997 until the cancer went into remission, arguably in December 1997. Hawaiian argues that a four-month disability is only temporary and not covered by the ADA.

5. The court does not consider whether Leicht was disabled in February 1998, when Leicht's former position, Director of Procedures and Training, was permanently filled. That time is irrelevant because a disability is measured at the time of the requested reasonable accommodation. *Burch,* 119 F.3d at 315. Leicht never asked that her position continue to be filled only on a temporary basis.

6. Leicht says in her declaration that, "[b]y the time this declaration is filed, I will likely have undergone open-heart surgery for triple bypass." Leicht Dec. ¶ 24. Possible eventualities cannot be considered in determining whether a plaintiff is disabled under the ADA. *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (requires that "a person be presently—not potentially or hypothetically—substantially limited"). Moreover, the relevant inquiry is whether Leicht was disabled at the time the accommodation was requested.

7. Conflicts between deposition testimony and an affidavit should be resolved in favor of the deposition testimony. *See, e.g., Russell v. Acme–Evans Co.,* 51 F.3d 64, 67–68 (7th Cir. 1995) ("Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy"). Here, there is no direct conflict. Leicht could have gone shopping using a wheelchair, while still substantially limited in walking and standing. Similarly, Leicht's ability to eat and care for herself does not negate substantial limitations on walking and standing, as she may have eaten and groomed herself and even bathed while sitting.

The court recognizes that temporary impairments often do not qualify as disabilities. *See Sanders,* 91 F.3d at 1354 ("temporary psychological impairment, from December 19, 1992 to April 5, 1993, with no residual effects after April 5, 1993, was not of sufficient duration to fall within the protections of the ADA as a disability"); *Burch,* 119 F.3d at 316 ("[p]ermanency ... is the touchstone of a substantially limiting impairment"); *see also* 29 C.F.R. § 1630.2(j), App. (1996) ("temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities"). However, the court cannot conclude that, as a matter of law, cancer that is life-threatening is not a disability if it is life-threatening for what Hawaiian characterizes as "only" four months.

In determining whether an impairment substantially limits a major life activity, courts are to consider not only the duration of the impairment, but the nature and severity of the impairment. *Sanders,* 91 F.3d at 1354. This court is required to measure disability on a case-by-case basis, looking at the effect the impairment has on the life of the individual. *See Albertsons, Inc. v. Kirkingburg,* 527 U.S. 555, 119 S.Ct. 2162, 2169, 144 L.Ed.2d 518 (1999) (there is a "statutory obligation to determine the existence of disabilities on a case-by-case basis"); *Runnebaum v. Nations-Bank of Md., N.A.,* 123 F.3d 156, 166 (4th Cir.1997) ("the statute's 'individualized focus' contemplates a case-by-case determination of whether a given impairment substantially limits one or more of the major life activities of the individual").

The cases cited by Hawaiian for the proposition that cancer of a short duration is not a disability are distinguishable. In *Ellison v. Software Spectrum, Inc.,* 85 F.3d 187 (5th Cir.1996), as well as in *Madjlessi v. Macy's West, Inc.,* 993 F.Supp. 736 (N.D.Cal.1997), not only did the plaintiffs' limitations last for a short time, there were no substantial limitations on major life activities. For example, in *Ellison,* although radiation treatment for breast cancer nauseated and tired the plaintiff, she

was still able to work. *Ellison,* 85 F.3d at 191. Similarly, in *Madjlessi,* the plaintiff continued to work while suffering from nausea, vomiting, and weakness. *Madjlessi,* 993 F.Supp. at 741.

Leicht has come forward with evidence demonstrating that the cancer and its treatment resulted in more debilitating side effects than the plaintiffs in either *Ellison* or *Madjlessi* suffered. Even in May 1998, when Leicht was at her healthiest, she was still limited in her ability to walk and stand. Given the severity of the cancer's impact on Leicht, the cancer's duration does not justify summary judgment.

The court denies summary judgment on the issue of whether Leicht had a disability.

### 2. There Are Genuine Issues Of Material Fact As To Whether Leicht Had A Record Of Impairment.

Although the parties did not address this issue, the court notes that there is also a genuine issue of material fact as to whether Leicht had a record of impairment. Under section 12102(2)(B), a person may have a disability under the ADA if she has a "record" of having a substantially limiting impairment. The regulations state: "Has a record of such impairment means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k).

"The Supreme Court has categorized an impairment that was 'serious enough to require hospitalization' as an impairment that substantially limits one or more major life activities." *Mark v. Burke Rehabilitation Hosp.,* No. 94 Civ. 3596 RLC, 1997 WL 189124, *4 (S.D.N.Y. Apr.17, 1997) (citing *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 281, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)). The Court has "found that a hospitalization sufficiently represents a record of that impairment." *Id.; see also Bizelli v. Amchem,* 981 F.Supp. 1254, 1257 (E.D.Mo.1997) (finding

that a plaintiff had established a record of impairment when the defendants were aware that the plaintiff had undergone surgery and chemotherapy to treat testicular cancer).

Although Leicht was hospitalized during treatment for her lung cancer, Goodman Dec. ¶ 5, a number of courts have held that hospitalization alone without a finding of actual substantial limitation does not suffice to demonstrate a record of disability. *See Burch*, 119 F.3d at 317. *See also Taylor v. United States Postal Serv.*, 946 F.2d 1214, 1217 (6th Cir.1991) (declining to interpret *Arline* "as establishing the nonsensical proposition that any hospital stay is sufficient to evidence a 'record of impairment' ").

Here, there is a genuine issue of material fact as to whether Leicht was substantially limited in a major life activity. Thus, summary judgment is inappropriate on the issue of whether Leicht was disabled because she may have had a record of disability.

B. *Leicht Has Not Met Her Burden Of Showing That, With or Without Reasonable Accommodation, She Was Able To Perform The Essential Functions Of The Positions She Sought At The Relevant Times.*

█ Although the court declines to grant summary judgment on the ground that Leicht was not disabled, the court finds no question of fact precluding summary judgment on the ground that Leicht has not met her burden of showing that, at the relevant times, she was able, with or without reasonable accommodation, to perform the essential functions of the positions she sought.

To establish a prima facie case under the ADA, Leicht must show that she was able to perform the essential functions of the job or jobs in issue with or without reasonable accommodation. Leicht has not done this. Leicht claims that she was able to perform the essential functions of two positions at Hawaiian: 1) her old position as Director of Procedures and Train-

ing, and 2) the position of Director of Security and Security Systems. Leicht does not meet her burden with respect to either position.

Leicht left vacant her old position of Director of Procedures and Training when she was diagnosed with terminal cancer in August 1997. At that time, she took an indefinite leave of absence. Leicht concedes that Hawaiian could have permanently filled this position during the period of August to September 1997, when Leicht initially took an indefinite leave of absence. Plaintiff's Memo. in Opp. at 22. In short, Leicht concedes that Hawaiian was under no obligation to keep her old job for her and fill it only on a temporary basis for an indefinite term. The record does not support Leicht's argument that circumstances later changed such that Hawaiian could not fill the position on a permanent basis.

█ In February 1998, Hawaiian was still unsure whether Leicht would return to work at all. At that time, Hawaiian filled the position on a permanent basis. Leicht had not then given Hawaiian a return-to-work date because she did not have one. She was still unable to resume her old job and does not even contend that any accommodation at all would have permitted her to return to work at that time. At most, Leicht was able to tell Hawaiian that her prognosis was good and that she hoped to be returning to work in May 1998. She did not even request that her replacement remain temporary in the interim. Indeed, it was not until April 1998 that Leicht was well enough to ask for her old position back. Although she now notes that only 72 days elapsed between the permanent filling of the position in February and her notification to Hawaiian in April, that specific enumeration of days is possible only in retrospect. When Hawaiian filled the position permanently in February 1998, there is no evidence that Leicht could do the duties of the Director position with or without reasonable accommodation, and Hawaiian had no idea when Leicht's return-to-work date would actually occur.

Hawaiian was still faced with what appeared to be Leicht's indefinite absence.[8]

Even if the relevant time period is not February 1998, when Hawaiian filled the position permanently, but instead April 1998, when Leicht asked for her old job back, Leicht cannot satisfy her burden of showing that she was able to perform the essential functions of her old job with or without reasonable accommodation in April 1998. By April 1998, Tajiri was already Leicht's permanent replacement in that position. Even if Hawaiian could have reasonably accommodated any physical limitations Leicht had, Hawaiian could not offer Leicht her old position because it was not available. Leicht could only have performed in that position if Hawaiian had removed Tajiri. This would have been an unreasonable accommodation that Hawaiian was not required by the ADA to offer. *See White v. York Int'l Corp.*, 45 F.3d 357, 362 (10th Cir.1995) ("the ADA does not require an employer ... [to] reassign the employee to an occupied position"). It is Leicht's burden to make some showing on this motion of how she could have performed with or without reasonable accommodation. She has not carried her burden.

While it is easy to understand Leicht's preference for returning to her former position as Director of Procedures and Training, to be sympathetic to her, and to wish that, after all her suffering, she could enjoy doing exactly what she likes, the ADA does not entitle her to a job that she could only perform if Hawaiian had kept it for her indefinitely.[9]

Even if Leicht was not qualified to be the Director of Procedures and Training in either February or April 1998, she argues that she was qualified for the position of Director of Security and Security Systems in August 1998. However, Leicht's own description of her abilities and limitations shows that she was not qualified for the security position. Leicht cannot stand for more than a few minutes without experiencing pain. Leicht Dec. ¶ 24. She said she was unable to walk or stand for more than "short periods" and "short distances." *See* Exhibit 12, attached to Plaintiff's Memo. in Opp. The Director of Security and Security Systems position is not a sedentary position. Instead, it "requires physical mobility and activity." Declaration of Norman Davies, Jr. ("Davies Dec.") ¶¶ 3; *see also* Declaration of Richard Bird ("Bird Dec.") ¶¶ 5–11. Its duties cannot be performed from behind a desk. Davies Dec. ¶ 3; Bird Dec. ¶ 11. Leicht's only response to this evidence is her bald assertion that she could indeed do the job.

8. Because Leicht was not able to return to work at all in February 1998 and therefore did not request her old position back, Hawaiian could not have had a duty to accommodate Leicht by reassigning her to her old position in February 1998. An employer's obligation to accommodate an employee's disability is usually not triggered until the request for accommodation is made by the employee. *See Ferry v. Roosevelt Bank*, 883 F.Supp. 435, 441 (E.D.Mo.1995) ("the duty to accommodate is generally triggered by a request from the ... employee .... In the absence of a request, it would be inappropriate to provide an accommodation"); *Davis v. Safeway, Inc.*, No. C–95–2759–VRW, 1996 WL 266128, *5 (N.D.Cal. May 14, 1996). Mere knowledge of a disability does not give rise to a duty to accommodate. *See Ferry*, 883 F.Supp. at 441. "The ADA does not require clairvoyance." *See Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir.1995).

9. Hawaiian had no duty to accommodate Leicht by offering her that specific position. *See Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir.1996) ("[a]n employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation"); *see also Hennenfent v. Mid Dakota Clinic*, 164 F.3d 419, 422 n. 2 (8th Cir.1998) (same); *Zamudio v. Patla*, 956 F.Supp. 803, 809 (N.D.Ill.1997) ("[a]s long as the employer offers an accommodation that is reasonable, the employer has satisfied its obligation"). Rather, "any reasonable accommodation by the employer is sufficient to meet its accommodation obligation .... Thus, where the employer has already reasonably accommodated the employee's [disability], the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship." *Cf. Cook v. Lindsay Olive Growers*, 911 F.2d 233, 241 (9th Cir.1990).

Rule 56 requires her to come forward with more. She must make some showing either of how she would perform the physical duties of Director of Security and Security Systems or of why the position does not actually require physical mobility and activity. In the absence of any such showing, this court cannot find that Leicht was qualified for the position.[10]

It was Leicht's burden to identify specific reasonable accommodations for which she qualified at the time her limitations became known. *See Barnett,* 157 F.3d at 748–49. Having failed to identify positions that she was qualified to fill, Leicht does not satisfy her burden of at least establishing a prima facie case. Because Leicht has not met her burden of showing that, at the relevant times, she qualified with or without reasonable accommodation for either of the two positions she sought, summary judgment in favor of Hawaiian is warranted on the ADA claim. *See id.*

Only after a plaintiff establishes a prima facie case must the court look at whether she has shown that Hawaiian breached its duty to provide reasonable accommodations without undue hardship to Hawaiian. *See id.* While this court need not, given Leicht's lack of evidence that she was qualified to fill the requested positions, examine whether Hawaiian could in fact be said to have offered reasonable accommodations to Leicht, the court notes that Hawaiian may well have offered Leicht a position for which she was qualified but that she refused.

Hawaiian offered Leicht a position as Manager, Customer Service Training, but Leicht rejected that position, saying she was unqualified and incapable of performing in that position. The reasons Leicht gave for asserting she was unqualified and incapable are questionable.

Leicht said in a letter that she was unqualified because she was unfamiliar with Sabre, Hawaiian's computer system, and because she lacked forklift training and jetbridge training certification. *See* Exhibit 15, attached to Plaintiff's Memo. in Opp. to Defendant's Motion for Summary Judgment. The same letter went on to say that, she "no longer [has] these qualifications and it would take at least a year to regain this knowledge." *Id.* At the hearing on this motion, Leicht conceded that this statement about "no longer" being qualified and needing a year applied to the required familiarity with Sabre, not to the forklift training and jetbridge certification. Leicht gives no explanation or evidence to support her assertion that it would take her a year to regain her former familiarity with Sabre. She offers, for example, no evidence that the refamiliarization process took others a year, or that the Sabre system had changed so substantially that the changes typically required a year to absorb. The court is left again with only her bald assertion.

Leicht conceded at oral argument that it would not take a year to obtain forklift training or jetbridge certification. While Leicht lacked such certification when the Manager position was offered, there is no evidence that she could not have obtained the certification before assuming the Manager position.

Nor is Leicht persuasive in arguing that she was physically incapable of performing the Manager position because it would have required her to conduct classroom training and she could only stand for short periods and walk short distances. *Id.* Nothing in the record suggests that the classroom training had to be conducted while standing. Presumably Leicht could have taught while seated. While the court need not and therefore is not finding here

10. Even if Leicht could have qualified for the position had it been substantially modified, the law did not require Hawaiian to reassign essential job functions to accommodate Leicht. *See Barnett,* 157 F.3d at 752. Nor was Hawaiian required to alter fundamentally the nature of the job in order to accommodate Leicht's disability. *Id.* "[A]n employer does not have to create a new position in order to accommodate reasonably a disabled employee." *Id.*

that the Manager position was a reasonable accommodation with duties Leicht could have performed, the court notes that Leicht has been as unable to support her argument on the Manager position as she has been with respect to the positions she wanted.

Leicht complains that, at the very least, Hawaiian failed to engage fully in the process of exploring Leicht's concern that she could not perform the duties of the Manager position. This alleged failure to engage does not, however, violate the ADA.

■■■ "The ADA and its regulations do not ... create independent liability for the employer for failing to engage in ritualized discussions with the employee to find a reasonable accommodation." *Barnett*, 157 F.3d at 752. While an employer can be liable for disability discrimination if a reasonable accommodation was available that the employer did not act upon, there is no independent basis of liability for failure to engage in the interactive process. *Id.* at 753. ("[i]f the employer is incorrect in its assessment of the existence of reasonable accommodation that would not unduly burden the employer (given the employer's knowledge of the employee's abilities), the employer is liable under the ADA for failing to provide reasonable accommodation .... Thus, an employer's decision not to engage in an interactive process may put it at peril, but it does not create liability independent from a resulting failure to accommodate the employee's disability").

Given the above, summary judgment is awarded to Hawaiian on Leicht's ADA claim.

### III. *Promissory Estoppel*

Leicht also asserts a claim of promissory estoppel. She says that Michael Conroy and Guy Hall promised her that she would have either her former job or a comparable job when she returned to work. She says that if Hawaiian had not made those promises she would not have continued to rent a house in Hawaii while being treated for cancer.

■■■ In Hawaii, "[a] promissory estoppel may arise as an application of the general principle of equitable estoppel to certain situations where a promise has been made, even though without consideration, if it was intended that the promise be relied upon and was in fact relied upon, and a refusal to enforce it would be virtually to sanction the perpetration of fraud or result in other injustice." *In re Herrick*, 922 P.2d 942, 950 (Haw.1996).

■■■ The elements of a promissory estoppel claim are: "(1) [t]here must be a promise; (2)[t]he promisor must, at the time he or she made the promise, foresee that the promisee would rely upon the promise (foreseeability); (3)[t]he promisee does in fact rely upon the promisor's promise; and (4)[e]nforcement of the promise is necessary to avoid injustice." *Id.* at 950–51.

Leicht's promissory estoppel claim fails for two reasons.

■■■ First, even assuming Hawaiian told Leicht it would give her either her former job or a comparable job when she returned to work, that statement did not amount to a "promise." A "promise" is " 'a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.' " *Id.* at 951 (citing *Restatement (Second) of Contracts* § 2(1) (1979)). The Hawaii Supreme Court identifies "manifestation of intention" as the "operative" term. *Id.* "A promisor manifests an intention if he believes or has reason to believe that the promisee will infer that intention from his words or conduct." *Id.*

The record does not suggest that Leicht was promised her former job or a comparable job. Rather, it appears that what Leicht construed as "promises" were instead expressions of hope and good wishes. The statements by Conroy and Hall as to the availability of a job with Hawaiian were made in the context of Leicht's terminal cancer diagnosis. Leicht had told Hawaiian that she had lung cancer and

that she had less than two months to live and less than a 1 percent chance of survival. Hall and Conroy knew Leicht's prognosis and wanted to be sensitive to her condition. *See, e.g.,* Hall Depo. at 55 ("the job was posted as a temporary position to be sensitive to Mitsie at that point. But it was the intent to make that a permanent position from the beginning"). Conroy and Hall naturally expressed hope that Leicht would return to work. The expression of good wishes does not give rise to promissory estoppel. *See Adams v. Ford Motor Co.,* 847 F.Supp. 1365, 1379 (E.D.Mich.1994) (statements that are "merely expressions of hope for the future" are "not the stuff that makes for recovery under promissory estoppel").[11]

 Second, even if, viewing the evidence in the light most favorable to Leicht, Hawaiian could be said to have made "promises" on which Leicht detrimentally relied, the promissory estoppel claim would still fail because the enforcement of the "promise" is not necessary to avoid injustice. Promissory estoppel is warranted only if the refusal to enforce the promise "would be virtually to sanction the perpetration of fraud or result in other injustice." *In re Herrick,* 922 P.2d at 950. Fraud or injustice is not present in this case. Hawaiian appears to have bent over backwards to assist Leicht after she was diagnosed with cancer. On the day of her diagnosis, she requested an immediate leave of absence, which Hawaiian granted. Leicht Depo. at 61–62. Hawaiian kept her on the payroll for almost three months just so she could become eligible for benefits under Hawaiian's long-term disability plan. *Id.* at 107; Conroy Depo. at 28–29. Throughout her leave of absence and until today, Leicht has received medical and dental benefits, as well as group life and accidental death and dismemberment insurance coverage. *See* Declaration of Aileen Nonaka ("Nonaka Dec."), attached as Exhibit 1 to Defendant's Reply; Leicht Depo. at 212. Finally, Hawaiian offered Leicht a job that it says would have provided the same pay as the Director position. These circumstances indicate that enforcement of the alleged promise is not necessary to avoid injustice. Accordingly, the court grants summary judgment on the promissory estoppel claim.

### CONCLUSION

For the reasons stated above, the court GRANTS Defendant's Motion for Summary Judgment on the ADEA, ADA, and promissory estoppel claims. The FMLA claim is dismissed with prejudice. This order disposes of all remaining claims asserted by Leicht. The clerk of court is directed to enter judgment in favor of Hawaiian.

IT IS SO ORDERED.

---

11. Even if Hall or Conroy made promises to Leicht, Leicht cannot show that she detrimentally relied on the "promises." This is an essential element of a promissory estoppel claim. Leicht says that, in detrimental reliance on Hawaiian's "promises" that she would have a job when she returned to work, she incurred the financial burden of continuing to pay rent in Hawaii while receiving cancer treatments in Seattle. However, it is uncontroverted that Hawaiian offered Leicht the Manager position, which would have paid the rent. In refusing that job, Leicht showed that any detriment to her could not have been financial.