TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-99-00216-CV






Jack Hart, Appellant



v.



City of Austin and City of Austin Emergency Medical Department, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT


NO. 97-10829, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING 







 Appellant Jack Hart brought suit against appellees the City of Austin and the City
of Austin Emergency Medical Department (collectively, the "City") alleging violations of the
Texas Human Rights Commission Act (the "Act"). (1) The district court granted an instructed
verdict (2) in favor of the City. On appeal, Hart contends that the instructed verdict was improper
and that the court abused her discretion in denying Hart's motion for leave to file a trial
amendment. We will affirm the district court's judgment.


BACKGROUND

 In reviewing an instructed verdict, we consider all of the evidence in the light most
favorable to the party against whom the verdict was instructed and disregard all evidence and
inferences to the contrary. See Qantel Bus. Sys., Inc. v. Custom Controls Co., 761 S.W.2d 302,
303-04 (Tex. 1988). Therefore, we present the facts in the light most favorable to Hart. 

 In 1989 Hart began his employment with the City of Austin Emergency Medical
Department ("EMS") as an emergency medical technician--a position that handles non-life-threatening emergencies. Three months after he started, Hart was promoted to paramedic--a
position that handles life-threatening emergencies. During his employment with EMS, Hart
received numerous awards including, for two consecutive years, Paramedic of the Year. In the
latter part of 1994, Hart was promoted to senior paramedic. After his promotion, Hart expressed
an interest in holding a command position within EMS. Hart began to participate in an informal
training program for a promotion to district commander, a position that entails both supervisory
and response responsibilities. (3) The program placed qualified senior paramedics in district-command positions that were temporarily vacated due, for example, to permanent district
commanders taking vacation. These temporary positions were called "acting district
commanders." Serving as an acting district commander allows a person to gain command
experience while helping EMS fill a temporarily vacant position.

 In 1995 Hart worked as an acting district commander for significant periods. 
Hart's supervisors had "nothing but praise" for Hart's abilities. Chief of Operations Gordon
Bergh "expressed his praise" for Hart's work and asked if Hart was still interested in a command
position. Hart replied that he was but wanted to be promoted directly to a permanent position. 
EMS has a practice of requiring district commanders to serve in an acting role immediately before
they are permanently promoted. This position carries the same title as the temporary position
previously held by Hart--acting district commander--but is different in that, after the "acting" or
probationary period, the acting district commander assumes the permanent position. An acting
district commander does not receive a higher salary and greater benefits until assuming the
permanent position.

 Hart was critical of this management practice. He found it unfair that someone
doing a district commander's job would not be paid at the same rate as a permanent district
commander. Hart expressed his discontent with this practice to Bergh and asked to be promoted
directly to a permanent district commander. Bergh replied that "there would be no problem with
that." Around this same time, Bergh made it known both to Hart and to others in EMS that Hart
was his choice for the next open district-commander position. (4) Hart considered these exchanges
to be a promise that he would be promoted directly to permanent district commander without first
serving in an "acting" capacity. 

 In February 1996 Hart was diagnosed with low-grade multiple sclerosis ("MS"). 
Hart's physician recommended that he try to stay away from physical demands; however, no
restrictions were placed on Hart because of his medical condition. 

 Bergh and Hart discussed Hart's future employment with EMS. Hart needed some
time away from the rigors of being a paramedic so that he could recuperate from the onset of his
MS. Bergh offered Hart a position in the clinical practice area, which consists of training other
paramedics, or a position in the communication division. Neither of these jobs appealed to Hart
because, unlike a paramedic or district commander, who worked for 24 hours and was off for 48
hours, the suggested positions required a regular, Monday through Friday, 40-hours-per-week
schedule. Hart testified that since he lived 60 miles from his workplace, it would not have been
economically feasible for him to commute to Austin five days a week. Bergh then offered him
the position of assistant to the shift commander. Hart accepted this job, and Bergh indicated to
Hart that he would always have a job with EMS. 

 In May 1996 Bergh approached Hart and informed him that EMS could not afford
to have Hart in his current position (5) and that they had a dire need for paramedics. Bergh told Hart
that he would have to either go back to being a paramedic, transfer to the communication division,
or go into clinical practice. Because Hart did not want to work a regular five-day-a-week
schedule, he chose to return to being a paramedic even though Hart believed he needed more time
to recover from his flare-up of MS. In June 1996 the physical activity of being a paramedic
aggravated Hart's MS, and he transferred to the communication division. Hart testified that he
still expected to be promoted to district commander when a position became available and that
although he could no longer perform the physical duties required of a paramedic, he could
perform the physical duties necessary to be a district commander.

 In the spring of 1996, Bergh began to formalize the training program for
commanders. Interested participants would undergo a performance evaluation and interview. 
EMS would then select certain candidates based on their initial performance. Once in the
program, the candidates would receive training to help them gain skills to become district
commanders. This training would include filling acting district-commander roles and attending
commander meetings. In creating this program, Bergh also added new duties to the district-commander position--the district commander would be required to spend one full 24-hour shift
every month as a field paramedic and also rotate into a paramedic position for six weeks every
year (the "field requirement"). Because Hart had already "proved himself" and had extensive
"acting" experience, he was exempt from this program.

 From June 1996 through December 1996, Hart worked in the communication
division. (6) Hart requested Bergh to allow him to function as an acting district commander, on a
continuing basis, when various permanent commanders were doing a six-week field rotation. 
Bergh refused because Hart already had sufficient temporary experience and others in the training
program needed the same experience. However, Hart twice filled an acting district-commander
position for a 24-hour shift.

 In December 1996 Bergh offered Hart an "acting" position during a district
commander's field rotation. While waiting to begin the temporary assignment, a permanent
district-commander position became available. Hart expected to be immediately promoted to the
position. He asked Bergh if, for the first two months, he could be exempt from the field
requirement. Bergh refused. Hart testified that Bergh told him that "he had offered [Hart] the
job before [he] had [MS], and that now things had changed and that [Hart] was going to have to
go and reprove [him]self." Hart "expressed [his] disgust" with Bergh's decision and told him that
he was going to speak to Sue Edwards, director of EMS. Hart repeated his demands to Edwards
with the same result.

 Hart requested a meeting with Edwards, Bergh, and other EMS executives. During
the mid-January 1997 meeting, Hart dropped his request for an exemption from the field
requirement. EMS offered Hart a position as acting district commander. Hart would serve in an
"acting" capacity for 60 days, after which EMS would evaluate Hart. EMS further extended Hart
a written guarantee that based upon his meeting the performance requirements, he would be
permanently appointed. Hart would also receive a five to seven percent raise during the "acting"
period. Hart testified that he did not think this was a "good faith offer," and he did not respond
by EMS's deadline. EMS reopened the position and several months later, after a competitive
interview process, EMS appointed a non-disabled paramedic from its training program, a person
whom Hart contends has qualifications inferior to his own. In April 1997 a second permanent
district-commander position became available. Hart did not apply for it, nor was it offered to
him. The position was also filled by a non-disabled person whom Hart claims has inferior
qualifications. Hart remained in the communication division until June 1998 when he left EMS.

 Hart filed a discrimination suit against the City under the Act. (7) Hart alleged that
the City unlawfully discriminated against him after he was diagnosed with MS by failing to
promote him to permanent district commander. He claimed that by including an "acting"
component in his promotion to district commander, the City discriminated against him. At the
conclusion of Hart's evidence, the City moved for an instructed verdict. The district court granted
the City's motion on grounds that there was legally insufficient evidence that Hart was a qualified
individual with a disability at the time of the employment action complained of and that Hart
suffered an adverse employment action.

 On appeal Hart challenges the district court's decision to grant an instructed
verdict, arguing that there is "more than a scintilla of evidence" in the record to support his
claims. Hart also contends that the court abused her discretion in denying his motion for leave
to file a trial amendment. 


DISCUSSION

 A party is entitled to an instructed verdict when reasonable minds can draw only
one conclusion from the evidence. See Corbin v. Safeway Stores, Inc., 648 S.W.2d 292, 295
(Tex. 1983). The appellate court's task is to determine whether there is any evidence of probative
force to raise fact issues on the material questions presented. See Qantel Bus. Sys., 761 S.W.2d
at 303-04. We must consider all of the evidence in the light most favorable to the party against
whom the verdict was instructed and disregard all evidence and inferences to the contrary. See
id. When reasonable minds may differ as to the truth of controlling facts, the questions must go
to the jury. See Corbin, 648 S.W.2d at 295. If we determine that evidence of probative value
exists, then the judgment must be reversed and the cause remanded for a jury determination. See
Qantel Bus. Sys., 761 S.W.2d at 303-04.

 Hart filed suit against the City alleging that it "committed unlawful employment
practices in violation of the Texas Employment Discrimination Act, Texas Labor Code, Section
21.001 et seq., when they refused to promote [Hart] to the permanent position of District
Commander and, instead, promoted two Acting Commanders with lesser experience and
qualifications." Hart alleges that "but for [his] disability . . . he would have been promoted to
the permanent position of District Commander." Hart does not allege, either in his petition or
on appeal, any cause of action based on a failure to accommodate him due to his disability. Hart's
lawsuit, instead, complains that the City's failure to promote him directly to permanent district
commander in January 1997 violates the Act.

 Section 21.051 of the Act states:


 An employer commits an unlawful employment practice if because of . . .
disability . . . the employer:


 (1) fails or refuses to hire an individual, discharges an individual, or
discriminates in any manner against an individual in connection with compensation
or the terms, conditions, or privileges of employment . . . .


Tex. Lab. Code Ann. § 21.051(1) (West 1996).

 The Act has among its express purposes to "provide for the execution of the
policies embodied in Title I of the Americans with Disabilities Act of 1990 ["ADA"] and its
subsequent amendments." Id. § 21.001 (West 1996). Because the Act seeks to promote federal
civil-rights policy, Texas courts look to analogous federal law in interpreting the Act with regard
to disability discrimination. See Austin State Hosp. v. Kitchen, 903 S.W.2d 83, 87-88 (Tex.
App.--Austin 1995, no writ); Farrington v. Sysco Floor Servs., Inc., 865 S.W.2d 247, 251 (Tex.
App.--Houston [1st Dist.] 1993, writ denied). Hence, we will rely on cases interpreting the ADA. 
See Morrison v. Pinkerton Inc., 7 S.W.3d 851, 854 (Tex. App.--Houston [1st Dist.] 1999, no
pet.).

 In order to establish a prima facie case of intentional discrimination based on
disability under the Act, a plaintiff must either present direct evidence of discrimination or show:
(1) he is disabled or regarded as disabled, (2) he is qualified for the job, (3) he was subjected to
an adverse employment action on account of his disability, and (4) he was replaced by or treated
less favorably than non-disabled employees. (8) See McInnis v. Alamo Community College Dist.,
207 F.3d 276, 279-80 (5th Cir. 2000) (citing Burch v. Coca-Cola Co., 119 F.3d 305, 320 (5th
Cir. 1997), cert. denied, 522 U.S. 1084 (1998)). The district court granted an instructed verdict
in favor of the City because Hart failed to establish the first, second, and third prongs of the prima
facie case--Hart produced legally insufficient evidence that he was a "qualified individual with a
disability at the time of the employment action complained of" and that Hart "suffered an adverse
employment action." (Emphasis added.)

 This Court may affirm an instructed verdict even if the trial court's reasoning is
in error, provided it can be supported on another basis. See Mulligan v. Beverly Enters.-Tex.
Inc., 954 S.W.2d 881, 884 (Tex. App.--Houston [14th Dist.] 1997, no pet.) (citing Hutson v. City
of Houston, 418 S.W.2d 911, 914 (Tex. Civ. App.--Houston [14th Dist.] 1967, writ ref'd n.r.e.));
Nelson v. American Nat'l Bank, 921 S.W.2d 411, 415 (Tex. App.--Corpus Christi 1996, no writ).

 Having reviewed the entire record, we conclude that Hart failed to produce
probative evidence showing that he was treated less favorably than non-disabled employees. 
Thus, Hart failed to establish a prima facie case because he failed to satisfy the fourth prong of
the standard. The evidence reflects that Hart was offered the position EMS had available--a
permanent district-commander position with a preliminary "acting" period; there is no evidence
to the contrary. 

 Viewed most favorably to Hart, the facts establish that he was a stellar employee
who was promised special, favorable treatment (being promoted directly to district commander
without having to do the acting time). However, when the City discovered Hart had MS, it
withdrew its previous offer and instead required Hart to follow the same promotion procedure as
other employees. Hart does not assert a claim for breach of promise or breach of contract. Hart
makes a claim for employment discrimination and therefore must establish all elements of a prima
facie employment-discrimination claim. See McInnis, 207 F.3d at 279-80. This includes proving
that he was treated less favorably than non-disabled persons. See id. 

 Both parties and the district court framed the issue as whether Hart "suffered an
adverse employment action." However, based on the record and the law, the preferable way to
frame the issue is whether Hart was treated less favorably than non-disabled employees. Hart
contends that there is evidence that he was not promoted to district commander as a direct result
of his diagnosis with MS--he testified to this fact (9) and introduced a recording of Edwards who said,
in response to Hart's complaint that he was not getting the job Bergh had promised him, "But
things have changed since then Jack, the fact that you were then capable of doing all of those
things, and now you're not. So things have changed." Hart also points to Edwards's testimony
that Hart's MS was a "factor" in her decision "to promote him into this position with an acting
component." This evidence, however, does not establish that Hart was treated less favorably than
non-disabled employees. Hart failed to produce probative evidence showing that non-disabled
employees could or would be promoted directly to a district-commander position while he, as a
disabled person, would first have to serve in an "acting" capacity. (10) It was Hart's burden to
establish a prima facie case of employment discrimination based on disability. See id. 

 The record reveals the following evidence regarding whether Hart was treated less
favorably than non-disabled employees. EMS follows a business practice of requiring potential
district commanders to serve in acting positions before they are promoted to the permanent
position. (11) However, this policy was not in writing; in fact, no policy "absolutely requires a
person serve in an acting capacity prior to his being permanently promoted into the job." 
Edwards testified that "[e]very commander that [she has known] since [she has] been at Austin
EMS has started out the job in an acting capacity." She explained that EMS's January 1997 job
offer to Hart was consistent with its policy:


 I felt we were very clear when we said that we wanted [Hart] to be a
commander, and that we would put him in the vacant position, that we were
treating him as we treated everyone else, and putting him in an acting capacity for
a period of time.


 . . . .


 The position we were offering him was a permanent position. It was not
an acting position. It was a permanent position, in which every person that we put
in that position goes in in an acting capacity.



Bergh's testimony emphasized that EMS generally promoted people into commander positions
with an initial acting period:


 Typically an appointment to a position without competitive interviews has
an acting part to it. It always does. [Bergh's acting time] was eight months, even
though [he] had worked as an acting Chief of Operations before.


 The two individuals that were promoted to permanent positions prior to
[Hart] . . . were under the same process. It was a very specific process involved.



Bergh testified that no one since 1995 has "promoted within [EMS's] command organization
directly into those jobs without having to act." Hart never produced any evidence to the contrary
but did testify that he "know[s] in the past [EMS] had promoted people immediately. There was
no acting period." Hart further explained:


Q: Now, do you know of any individuals in the organization who promoted
directly into the job of district commander without having to do the acting time?


A: Yes, sir, I do.


Q: Who are those individuals?


A: I know of one for sure, Mike Compton. I suspect there's others.



This was the extent of Hart's testimony. He gives no time reference for this event and does not
dispute the City's evidence that since 1995, no one has promoted directly to a district commander
position. In his testimony, Hart indicated that because he had acted for 40 percent of the year
preceding his diagnosis of MS and because Bergh told him that he already had enough acting
experience, EMS should have promoted Hart directly to district commander. However, Edwards
testified that there have been "several" people who had spent 40 percent of their time in
temporary acting positions and they were still required "to go into the command position in an
acting capacity." Hart has not produced any probative evidence that he was treated less favorably
than non-disabled employees. All evidence introduced at trial indicates that Hart was treated in
the same manner as all other employees. (12)

 We overrule Hart's first issue and hold that the district court properly granted an
instructed verdict on the ground that Hart failed to produce probative evidence that he was treated
less favorably than non-disabled employees, an essential element of his prima facie case. See
McInnis, 207 F.3d at 279-80. 

 Because we have determined that Hart failed to establish a prima facie case of
employment discrimination, we do not reach Hart's second issue asserting that the district court
erred in failing to grant a trial amendment relating to whether Hart was legally disabled, another
element of the prima facie case. See Tex. R. App. P. 47.1. (13) 


CONCLUSION

 We hold that Hart failed to carry his burden of establishing a prima facie case of
employment discrimination. Having disposed of all of Hart's issues, we affirm the district court's
judgment.



 __________________________________________ Lee Yeakel, Justice

Before Justices Jones, Yeakel and Patterson

Affirmed

Filed: August 31, 2000

Do Not Publish
1. Tex. Lab. Code Ann. §§ 21.001-.306 (West 1996 & Supp. 2000).
2. See Tex. R. Civ. P. 268. Rule 268 is titled "Motion for Instructed Verdict" and provides
that "a motion for directed verdict shall state the specific grounds therefor." Id. (emphasis
added). The terms are synonymous.
3. District commanders are responsible for all of the units in their respective districts. In
addition to managing the paramedics in their districts, commanders may also be called to an
emergency if necessary. 
4. Bergh could only recommend someone to fill a district commander position. Sue Edwards,
the director of EMS, made all final hiring decisions for district commanders.
5. Bergh testified that this position was always meant to be temporary and that he had
approved Hart for this position for 60 days. Hart stated that he was not aware that this job was
to be temporary.
6. There is no evidence that Hart's salary or benefits were reduced after he was diagnosed
with MS.
7. See Tex. Lab. Code Ann. §§ 21.001-.306.
8. It is not clear from Hart's pleadings or his testimony at trial whether he is seeking recovery
under a direct method of proof or the indirect method. Because we locate no direct evidence of
discrimination in the record, we presume Hart is attempting to use the indirect method to prove
discrimination.
9. Hart gives very general citations to the record for this testimony. We have carefully
reviewed the record and the strongest testimony from Hart addressing this issue is when Hart
testifies that both Bergh and Edwards stated that "things had changed" since he was diagnosed
with MS.
10. There is no evidence that the person who eventually filled the district-commander position
offered to Hart on January 15 did not serve in an acting capacity first.
11. This fact is bolstered by Hart's own testimony that he was critical of this particular
management practice. 
12. Hart cites no authority in his brief regarding whether EMS's actions constituted an adverse
employment action and cites no authority indicating that Hart has established a prima facie case
of employment discrimination.
13. For purposes of this opinion, we have assumed without deciding that Hart was legally
disabled by virtue of his MS diagnosis.



1) Regular">go into the command position in an
acting capacity." Hart has not produced any probative evidence that he was treated less favorably
than non-disabled employees. All evidence introduced at trial indicates that Hart was treated in
the same manner as all other employees. (12)

 We overrule Hart's first issue and hold that the district court properly granted an
instructed verdict on the ground that Hart failed to produce probative evidence that he was treated
less favorably than non-disabled employees, an essential element of his prima